(No. 20699

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MAURICE A. BARNETT *et al.* Plaintiffs in Error.

*Opinion filed December 17, 1931—Rehearing denied Feb. 5, 1932.*

ROTHBART & LEWIS, DWIGHT McKAY, and HAROLD L. LEVY, (FRANK JOHNSTON, JR., of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., EDWARD E. WILSON, and OTHO S. FASIG, of counsel,) for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Maurice A. Barnett, Max Krakow, Laura B. Price, Joseph Baum and Ben Levin were indicted in the criminal court of Cook county for conspiracy to obtain $17,945.75 from the Corporation of the Royal Exchange Assurance of London, England, a corporation, by insuring certain jewelry and fur coats in the possession of Laura B. Price against loss and falsely pretending that they were taken from her in a robbery. Barnett and Krakow obtained a severance from the other defendants and were tried by a jury and found guilty. Barnett was sentenced to imprisonment in the penitentiary, and Krakow to a term of six months in the county jail and to pay a fine of $500. On a writ of error, the Appellate Court for the First District affirmed the judgment of the criminal court. The case is here for a further review.

The substance of the evidence introduced by the prosecution is that late in the spring of 1928, Baum met Krakow, a manufacturing jeweler, in the latter's office in Chicago and proposed that they obtain an appraisal of jewelry, cause

the jewelry to be insured and used in a pretended robbery of some third person, a party to the scheme, and procure satisfaction for the supposed loss from the insurance company. Krakow named Barnett, who had a desk in his office and had been engaged in the jewelry business, as a person who might be induced to enter into the arrangement. When the proposition was submitted to Barnett he suggested that Mrs. Price would probably be willing to supply the jewelry. Barnett afterwards learned that she was ready to join them but he told Baum and Krakow that she did not own sufficient jewelry for their purpose. Barnett and Krakow supplied the additional jewelry desired and Mrs. Price obtained an appraisal upon her own and the borrowed jewelry and also upon two fur coats. Baum then requested Oscar Serlin, an insurance broker of his acquaintance, to call at Krakow's office. Serlin responded and there met Baum, Barnett and Mrs. Price. After negotiations with one company had failed, representatives of the Corporation of the Royal Exchange Assurance of London accepted the application and that company, on January 21, 1929, issued its policy to Laura B. Price in the sum of $22,150, covering a platinum watch, a pearl chain, a pearl necklace, two platinum diamond rings, two platinum diamond bracelets, a platinum diamond brooch, a platinum diamond and sapphire brooch, a mink coat and a mole coat. Levin, at Baum's request, advanced $334 to Mrs. Price to pay the premium.

The approximate sum of money which Mrs. Price would receive from the insurance company for the pretended loss and how this money and the jewelry which would remain in their possession should be divided were subjects of discussion between Baum, Krakow and Barnett. According to their plan of division, Mrs. Price would receive one-third and Barnett, Baum, Krakow and Levin two-thirds of the money and Mrs. Price would surrender her mink coat and watch, but the other items of jewelry would be returned to her after they were re-mounted.

The plan of the pretended robbery was finally agreed upon about the middle of February, 1929. Mrs. Price had pawned one of the rings insured in order to obtain a loan of $500. It was deemed wise to redeem the ring before the robbery was perpetrated, but she did not possess sufficient money to make the redemption. To assist her, Baum borrowed $325 upon his wife's ring and gave the money to Barnett who turned it over to Mrs. Price. With additional funds of her own, she redeemed the ring on the morning of February 25, 1929. In the afternoon of the same day, Baum first drove his automobile to Levin's restaurant on the West Side in Chicago, and later, at about 5:30 o'clock, accompanied by Levin, arrived at 61 East Goethe street, the address of Mrs. Price's modiste. Mrs. Price had told them that a Lincoln automobile, bearing a Florida license, would be standing in the street at or near this point and they discovered the car upon their arrival. They stopped their automobile immediately behind the Lincoln car and waited for Mrs. Price. In about five minutes she appeared, crossed the street toward her automobile and upon seeing Baum began to remove her mink coat. Baum advised her not to do so in the street but suggested that she first enter her automobile. She complied with his suggestion and then removed her coat. Her hand-bag contained the jewelry and she gave the bag and her coat to Baum. She returned to the apartment building where her modiste resided, and upon reaching the lobby pretended to faint away and later reported her loss. Baum and Levin drove to the latter's home on North Western avenue, the coat was left there, and Baum took the jewelry, wrapped in a handkerchief, to Krakow's office and delivered it to Krakow at about 7:00 o'clock that evening.

Mrs. Price submitted the usual proof of loss to the insurance company. Afterwards, at the request of the company's attorney she furnished an additional detailed statement concerning the robbery, and received from the insur-

ance company $17,945.75 by two drafts one dated June 25, 1929, for $2000, and the other dated July 25, 1929, for $15,945.75, in satisfaction of the supposed loss. Baum, Krakow and Barnett again met and discussed the subject of the division of the insurance money and of the jewelry reported as stolen. Baum and his wife interviewed Mrs. Price concerning the portion Baum was to receive. Differences of opinion arose and on the next day Mrs. Price, by the delivery of currency to Mrs. Baum, refunded the advancements made for the insurance premium and to redeem Mrs. Price's ring. Baum received from Krakow the pearl necklace, several small diamonds, three two-karat diamonds and the watch. Levin received some pearls and the mink coat. Baum and Levin were not satisfied with what they had received, and in October, 1929, confessing their part in the conspiracy, informed the attorney for the insurance company that the robbery was pretended and the loss fictitious. The attorney promised them that, in view of their confession, he would intercede in their behalf with the prosecuting authorities. Baum afterwards related the facts of the conspiracy to certain police officers of the city of Chicago. Both Baum and Levin, who are brothers-in-law, were called by the State and testified against the plaintiffs in error.

The coat, the watch and the necklace were identified by Baum, but he was unable to state whether certain diamonds shown him were in Mrs. Price's hand-bag at the time of the pretended robbery. The supplemental statement made by Mrs. Price at the request of the insurance company's attorney; records showing the withdrawal of $600 from her bank account about the time she refunded the advancements made for her, and a pawn ticket for a diamond ring signed by her were introduced in evidence.

The plaintiffs in error denied their guilt. Barnett admitted that he had been acquainted with Mrs. Price for ten or twelve years. He testified that in January, 1929, he

met her in the Marshall Field Annex building, Chicago, when he introduced Serlin, the insurance broker, to her, but nothing was said about insurance; that he, Barnett, repaired some jewelry for Mrs. Price shortly thereafter; that on another occasion he went to her hotel to show her some jewelry designs; that he had seen Baum in Krakow's office, but held little conversation with him, and that he never saw Mrs. Baum and was not acquainted with Levin. Krakow testified that he sold Baum a watch and that the latter called at his office twice thereafter; that he never had any dealings with Serlin, and that he never saw Serlin or Mrs. Price. A number of witnesses testified that the reputations of Krakow and Barnett for honesty and integrity were good. With respect to Barnett, there was countervailing testimony on rebuttal. Mrs. Price was not called as a witness and did not testify.

The indictment charges that the Corporation of the Royal Exchange Assurance of London, the insurance company defrauded, was a corporation. The first contention of the plaintiffs in error is that the State failed to prove the corporate existence of the company. J. Austin Eckstein, assistant manager of the Chicago branch of Appleton & Cox, Inc., testified that his company was an agent for the Corporation of the Royal Exchange Assurance of London, England; that the latter company issued policies of insurance, a safe estimate of the number of which during twelve years, to his knowledge, was in excess of fifty thousand, and that the company collected premiums, issued drafts, paid claims and conducted a general insurance business. An objection was interposed to this proof of corporate existence. There was, however, evidence upon the subject in addition to Eckstein's testimony. The application of Mrs. Price for insurance addressed to the Corporation of the Royal Exchange Assurance of London, the policy of insurance issued to her by that company, and testimony by an attorney and by agents that they represented

the Corporation of the Royal Exchange Assurance of London were admitted. The word "corporation" was a part of the name of the company and the name appeared in various written instruments admitted in evidence. Apart from Eckstein's testimony, the evidence showed the existence of the company purporting to be a corporation and exercising corporate functions in this State. In the absence of countervailing evidence, the proof was sufficient under the act of June 3, 1889, (Cahill's Stat. 1931, p. 1091; Smith's Stat. 1931, p. 1094), which provides that in all criminal prosecutions involving proof of the legal existence of a corporation, user shall be *prima facie* evidence of such existence.

It is further contended that the court erred in permitting the State to introduce the written statement made by Mrs. Price concerning the facts of the alleged robbery, because she was not tried with the plaintiffs in error, nor did she testify on their trial and no opportunity to cross-examine her was afforded, in consequence of which, the plaintiffs in error argue, they were deprived of the right guaranteed by section 9 of article 2 of the bill of rights, to meet the witnesses against them face to face. The indictment was for a conspiracy between the plaintiffs in error, Mrs. Price, Baum and Levin to obtain money from the insurance company by means of the pretended robbery. The written statement to which objection is made was obtained from Mrs. Price by the attorney for the insurance company because the proof of loss which she had submitted was unsatisfactory and the company desired a complete detailed statement of the facts and circumstances of the crime which gave rise to the claim upon the policy of insurance. Before the statement was introduced in evidence a *prima facie* case of conspiracy, to which the plaintiffs in error and Mrs. Price were parties, had been established. The statement was made in furtherance of the common design and it was therefore the statement of all the members of the

conspiracy. The presence of every conspirator at the time the statement was made, a joint trial with its author, or her personal appearance as a witness, the conspiracy having been shown, were unnecessary to make the statement admissible in evidence. *Graff* v. *People,* 208 Ill. 312; *People* v. *Nall,* 242 id. 284; *People* v. *Walczak,* 315 id. 49; *People* v. *Drury,* 335 id. 539.

The contention is made that the trial court erred in admitting the testimony of Etta Baum, the wife of Joseph Baum, one of the co-indictees, concerning a conversation she had with Mrs. Price after the insurance company had satisfied the claim made upon its policy. Mrs. Baum testified that, early in September, 1929, accompanied by her husband, she called upon Mrs. Price seeking $5000 as her husband's share of the money paid by the insurance company; that Mrs. Price answered she had no such understanding of the arrangement; that the witness then reminded Mrs. Price that her jewelry had been pawned to raise money in order that a ring which Mrs. Price previously had pledged might be redeemed and that on the next day Mrs. Price, in the lobby of a down-town office building, refunded, by paying to Mrs. Baum in currency, a sum equal to the money advanced to redeem Mrs. Price's ring and to pay the insurance premium. The testimony of Mrs. Baum, it is argued, is inadmissible upon two grounds, first, because section 5 of the Evidence act continues the exclusion, with certain exceptions presently inapplicable, of the testimony of a husband or wife for or against the other concerning any transaction or conversation occurring during the marriage, and second, because the conversation was held after the termination of the conspiracy. The answer to the first proposition is that Baum was not on trial; that Mrs. Baum was called by the State as a witness in a criminal prosecution and that she did not testify either for or against her husband (*Graff* v. *People, supra*). With respect to the second proposition, it may be observed that the con-

spiracy was not terminated by the receipt of the money from the insurance company but continued thereafter to include the division of the proceeds of the criminal enterprise among the parties to it. The conversation tended to show a fact relevant to the issue and was admissible. *People* v. *Billburg,* 314 Ill. 182.

The testimony of an officer ·of a pawner's association that a ring had been pledged by Laura B. Price, of the Seneca Hotel, for a loan of $500 and that she had redeemed the ring on a certain day, it is contended by the plaintiffs in error, was inadmissible. Redemption of the ring was made on the day the pretended robbery occurred and the identity of Laura B. Price who received the money from the insurance company with the person who signed the pawn ticket was shown. The testimony constituted a link in a chain of circumstances to establish the conspiracy and was relevant to the issue.

It is contended that the court erred in admitting the records of a certain bank for the purpose of showing, and in permitting the auditor of the bank to testify, that $600 had been withdrawn on September 6, 1929, by one Mrs. Laura B. Price of the Seneca Hotel. The evidence was introduced to corroborate the testimony of Baum and his wife that Mrs. Price had paid Mrs. Baum approximately $659 in money on the same day. Laura B. Price, a member of the conspiracy, kept an account in the particular bank and resided at the Seneca Hotel. Proof of the withdrawal of $600 from the bank was not made incompetent because the person who withdrew the money disbursed a somewhat larger sum shortly thereafter. Identity of name, place of residence and bank of deposit and the time and amount of the money withdrawn were circumstances tending to corroborate the testimony of Baum and his wife respecting the payment of money by Mrs. Price to Mrs. Baum. The weight to be given these circumstances was a question for the jury to determine.

The court erred, it is contended, in permitting Baum and Levin to testify to a conversation between Baum and Luther F. Binkley, the attorney for the insurance company, concerning the sale of Mrs. Price's coat, because, it is said, the conversation occurred after the conspiracy had terminated. During the cross-examination of Baum only a part of the conversation had been adduced by counsel for the plaintiffs in error. On the re-direct examination of the witness, the State sought to show the whole of the conversation and the objection was then interposed. No similar objection was made to Levin's testimony. Under these circumstances, the contention is not available to the plaintiffs in error. *People* v. *Armstrong,* 299 Ill. 349.

Complaint is made that the assistant State's attorney, in his argument to the jury, was guilty of misconduct which was highly prejudicial to the plaintiffs in error. Mrs. Price asserted in her written statement that, in the robbery, her pearl necklace had been forcibly jerked from her neck. The necklace had been admitted in evidence and the prosecuting attorney, to illustrate how pearls would scatter with the consequent loss of some of them, if forcibly taken as claimed, broke a string of cheap beads with considerable force scattering them in all directions and striking one or more of the jurors. Counsel for the plaintiffs in error interposed an objection, the objection was sustained and the court instructed the jury to disregard the incident. Following the ruling and instruction the assistant State's attorney told the jury to forget that he had broken the string of beads but to consult their observation and experience respecting the scattering and loss of pearls when the string which held them together was broken. No objection was made to this request and no question concerning it is preserved for review (*People* v. *Boetcher,* 298 Ill. 580). The beads had not been and could not be admitted in evidence and their use by the assistant State's attorney in his argument was without justification. The demonstration, how-

ever, was not inherently prejudicial, and in view of the trial court's ruling and instruction, it had no adverse or harmful effect upon the rights of the plaintiffs in error.

Certain remarks and insinuations by the assistant State's attorney in his argument to the jury, the plaintiffs in error assert, were unwarranted and deprived them of a fair trial. The first of these remarks was that the plaintiffs in error were "the kind of men that go around to your widows after you are gone and fleece them out of the insurance money." An objection to the remark was made and sustained. A second instance concerned the question whether Baum and Levin would be punished for their part in the conspiracy. Counsel for the plaintiffs in error in their argument had denounced them and asserted that they would be given immunity from punishment. The assistant State's attorney, in turn, characterized Baum and Levin as bums, vehemently denied they would receive immunity and asserted that if they did, "the judge and bench must be co-conspirators with those that give them the immunity bath." An objection to these remarks was overruled. A little later the assistant State's attorney charged that Mrs. Price's attorney had been present in the court room each day "collaborating" with the attorneys for the plaintiffs in error "to fool" the jury. Objection was made to this statement, but the objection was overruled. The assistant State's attorney further asserted that no person in the court room "knows how many victims Barnett has put in the same position that poor Mrs. Price is in;" he wondered "how many of those ladies he," Barnett, "had on his hip and how many he got to put up a fake jewelry hold-up;" he did not know whether Mrs. Price "was one of those ladies of leisure" who through losses by gambling "fall into the clutches of fellows like Barnett," and he asked the jurors to make their "own deductions" why Barnett once visited Mrs. Price at her hotel when she could have called upon him at his place of business. To none of these remarks and insinu-

ations was an objection interposed. Finally, when Barnett
left the court room for a brief period during the assistant
State's attorney's argument, the latter remarked, "Barnett
is gone; he does not want to sit in here." An objection to
the remark was sustained. A verdict must be based upon
the evidence and not upon counsel's assertions neither sup-
ported by nor deducible from the proof. The remarks of
the assistant State's attorney, to some of which objections
were not interposed, transgressed the limits of proper argu-
ment and should not have been made. Transgressions of
this character cannot be condoned in any case and where
the effect is prejudicial, justice requires a reversal of the
judgment. The remarks of the assistant State's attorney
were unwarranted and undignified and would scarcely in-
fluence a jury of average intelligence against a defendant.
The conclusion that their effect upon the jury was prejudi-
cial to the plaintiffs in error has no substantial basis. More-
over, in every instance except two the court sustained the
objection or none was made. The remarks in the two in-
stances in which the objections were overruled, were clearly
harmless.

Complaint is made of the giving of the fourth, seventh,
eighth and tenth instructions requested by the prosecution.
The fourth instruction informed the jury that the plaintiffs
in error might testify in their own behalf, and it set forth
certain tests for the determination of their credibility. The
instruction was limited to the plaintiffs in error and was
therefore incomplete. Substantially the same tests, how-
ever, were stated in the third instruction asked by the prose-
cution and were made applicable to all the witnesses in the
case. While an instruction which mis-states the law can
not be cured by another which correctly sets forth the law
upon the same subject, yet an instruction which is merely
incomplete may be supplemented by other instructions. *Peo-
ple* v. *Lenhardt,* 340 Ill. 538; *People* v. *Shader,* 326 id. 145.

By the seventh instruction the jury were informed that the testimony of an accomplice is competent evidence; that his credibility is for the jury to pass upon as they pass upon the credibility of any other witness; that his testimony must be received with great caution, but, if it carries conviction and they are convinced of its truth, they should give it the same weight as they would the testimony of a witness not implicated in the offense. The eighth instruction was also to the effect that an accused person might be convicted upon the uncorroborated testimony of an accomplice. Neither the seventh nor eighth instruction was a complete statement of the law with regard to an accomplice's testimony. The eighth instruction requested by the plaintiffs in error informed the jury that the testimony of an accomplice is liable to grave suspicion and should be acted upon with great care and caution; that it should be subjected to careful examination in the light of all the other evidence in the case; that the influence under which it was given and whether the purpose of the witness was to shield himself from punishment, to obtain some benefit or to gratify his malice should be considered; and that the jury ought not to convict upon such testimony alone unless after a careful examination of it they were satisfied beyond a reasonable doubt of its truth and that they could safely rely upon it. While the seventh and eighth instructions were incomplete, they were supplemented by the eighth instruction given at the request of the plaintiffs in error, and the jury, by considering the three instructions, would not be misled with respect to the law concerning the testimony of accomplices. *People* v. *Lenhardt, supra; People* v. *Shader, supra; People* v. *Rees,* 268 Ill. 585, p. 594.

The tenth instruction, given at the prosecution's request, related to circumstantial evidence and was the same as the twelfth instruction in *People* v. *Guido,* 321 Ill. 397, and there approved. The instruction has been held improper where the evidence was all direct. There was circumstan-

**140**

tial evidence in the present case, and the instruction was properly given.

The final contention of the plaintiffs in error is that the verdict was the result of passion and prejudice. The facts and circumstances shown by the evidence do not support the contention. The evidence was sufficient to convict, and there is no basis or justification for interference with the jury's verdict.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*