(No. 23037

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MORRIS SCHACHTER, Plaintiff in Error.

*Opinion filed October 24, 1935—Rehearing denied Dec. 4, 1935.*

Thomas Marshall, (Thomas J. Symmes, and John B. Fruchtl, of counsel,) for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and A. B. Dennis, (Edward E. Wilson, Henry E. Seyfarth, and John T. Gallagher, of counsel,) for the People.

Mr. Justice Jones delivered the opinion of the court:

Morris Schachter has sued out a writ of error to the criminal court of Cook county to review his conviction of the crime of confidence game.

The indictment contained two counts. The first count charged that defendant fraudulently obtained from Harry Eager $1250 in currency and two checks for $2850 and $1200, respectively, by means of the confidence game. The second count charged the obtaining of the money and checks by false pretenses. A jury was waived and the cause was tried by the court. Defendant was found guilty under the confidence game charge and sentenced to the penitentiary. No finding was made under the false pretense count. The adjudication of guilt on the confidence game count without any finding on the false pretense count amounts to an acquittal upon the latter charge. (*People* v. *Smithka,* 356 Ill. 624; *People* v. *Lardner,* 296 id. 190; *People* v. *Weil,* 243 id. 208.) Our consideration of the cause is therefore limited to the confidence game charge.

The controversy centers about Eager's purchase of a half interest in some miniature amusement devices to be operated by him and Schachter in the Midget Village, a concession at A Century of Progress, commonly called the World's Fair of 1934. The principal ground urged for reversal is that the evidence is not sufficient to sustain the conviction.

At the time of the transactions complained of, Schachter was a resident of Chicago and had been engaged in the carnival and show business for twenty years. He and his family had lived at the Wellington Arms, an apartment hotel on Sheridan road. Eager was in the real estate and investment business and also conducted a "booking" business, in which bets on horse races were taken. In April, 1934, Schachter bought three miniature "rides"—*i. e.*, a whip, a merry-go-round and a chairoplane—from a man named Rogers, who had them stored in a car-barn on Sedgwick street. Schachter had a concession in the Irish Village, three others in the Streets of Paris, and contracted for space for the rides in the Midget Village. He sold a half interest in the rides to G. Vogel, who later desired to dispose of his interest and sold it through his broker, Alvin Abrams, to Eager for $1200. Prior to the consummation of the sale Eager said he would like to see the rides before he purchased and went with Schachter to the car-barn to inspect them. Eager testified that he was not able to see them because they were in a locked van, and that Schachter said it was too much trouble to unload them and guaranteed they were in good condition. The weight of the testimony shows they were not in any van at that time but were on the floor of the car-barn and Eager had ample opportunity to inspect them. They were not loaded until they were taken to the fair about two weeks after Eager's purchase, and he was there on that occasion. On May 16, Eager, using the name of Harry Gordon, in which he carried a bank account, made his check to Vogel for the purchase price and gave it to Schachter, who sent it by his brother-in-law, Matt Maloney, to the broker, Abrams. Vogel endorsed it and received the money less Abrams' commission. There is no testimony tending to show that Schachter received any part of it. The rides were in good condition, except that the center pole of the chairoplane was bent. It was sent to the factory to be straightened and

the rides were all erected at the Midget Village. Meanwhile, Schachter and Eager agreed to enter the concession business together and to add miniature steam railroad trains to their equipment. Schachter gave Eager a half interest in his contract at Midget Village and on May 10 they leased additional space for operating the trains. The lease called for a down payment of $500, of which each paid one-half. Eager testified that Schachter told him the three miniature rides would not be enough to make any money, and that he had a friend, M. Bryan, in Omaha, Nebraska, who had some miniature trains which he could buy for $6200; that Schachter told him he had talked with Bryan, and showed witness a photograph and literature concerning a locomotive, which Schachter said were received from Bryan. The photograph introduced in evidence is mounted on cloth. On the back there is printed with a rubber stamp the name and address of a Kansas City, Kansas, dealer in such equipment. Eager testified that the printed matter was covered by adhesive tape, and that he knew the tape was there for some purpose and removed it as soon as he got out of Schachter's sight. Schachter testified there was no tape on the picture and that he showed Eager the address on the back and told him to negotiate with the company. The picture does not show any evidence of anything having been stuck on the back. Two police officers testified that when Schachter was arrested he said he had outsmarted Eager in a business deal for about $5000. Schachter denied making the statement and testified that he told the officers Eager was a "welcher" because the deal was not profitable.

Eager testified that on May 12 Schachter asked him to go to his apartment, and when they arrived Schachter picked up the telephone and asked the operator to get Mr. Bryan, at Omaha; that in two or three minutes the telephone rang and Eager talked with somebody purporting to be Bryan in Omaha, who told him the trains were worth about $25,000 but could be bought for $6200, and

said that if he was not satisfied he could return them and Bryan would re-pay the purchase price; that Bryan required a deposit of $500 and requested it be mailed to him at Omaha but declined to give a street address, because he said he might be in St. Louis and would pick it up later. Schachter denied the incident, and the records of the apartment building and the telephone company do not show any such communication. The telephone operators testified that no local telephone call was substituted for the alleged long distance call. On that day Schachter and Eager each contributed $250 and Eager sent the money to Bryan at Omaha by telegraph, "positive identification required." It was sent to the street address where Schachter's sister-in-law, Anna McGuire, and her husband, resided. Schachter told Eager that Bryan lived there. On the same day Schachter wired Mrs. McGuire informing her of the remittance and asking her to accept and hold it. The money order showed it had been endorsed by M. Bryan.

Eager also testified that Schachter told him Bryan said he would ship the trains from Omaha by freight, but later gave him a telegram from Bryan stating they would be shipped by large motor truck direct to the fair ground. The trains arrived at the fair ground by truck at 8:30 A. M. on Monday, May 19, accompanied by a custodian, Probasco. Schachter and Eager reached there about 9:00 o'clock. Probasco refused to release the shipment until the balance of the contract price was paid. Eager testified he demurred to making the payment until he saw what he was buying and asked Probasco to stay and show them how to operate the trains; that Schachter told him Probasco was in a hurry to get back to Omaha and that the trains were all right and he would guarantee Eager against any loss; that all three of the men went to the Auditorium Hotel, Probasco saying he was sick; that Eager and Schachter went to the latter's office, where, after answering a telephone call, Schachter told him Probasco said he

was tired of waiting and would take the equipment back to Omaha unless he got his money right away; that thereupon Eager gave Schachter a check payable to the order of M. Bryan for $2850, his half of the unpaid purchase money; that Schachter made out and signed a check for a similar amount and they went back to the hotel; that Eager waited in the lobby while Schachter went up-stairs in an elevator; that he returned in about two minutes and reported that he had delivered the checks to Probasco; that Schachter agreed to pay half the expense of installing the trains but did not pay anything; that on May 22 Eager gave Schachter three one-hundred dollar bills for the freight from Omaha, and that men worked on the engines for weeks but were never able to get them in good working condition.

The trains consisted of three engines and twelve cars, with about 3000 feet of track. The boiler of one engine was bad. There was a new boiler for it which had not been installed and it was used for "ballyhoo" to attract patronage. Prior to May 14 the equipment was owned by George W. Crowley, who operated it the previous year at Riverview Park, in Chicago, and it was stored there until it was delivered at the fair ground.

Schachter testified that Bryan and Maloney came to Chicago about May 1 to buy rides for concessions at the fair or for a park at Omaha; that Maloney told him of the rides at Riverview and inspected them in company with Schachter, and later told him a deal with Crowley had been concluded except for a temporary delay on account of an outstanding mortgage; that about May 11 Schachter told Eager of the visit of Bryan and Maloney and that they were making a deal for the trains at Riverview Park; that he did not see Maloney from May 1 until May 13, and that on the latter date Maloney told him he had come to conclude the deal with Crowley; that Maloney had no money with him, and on the next day, at his request, Schachter

advanced $900 balance due on the purchase price, taking a bill of sale as security; that he understood that $500 had previously been paid to Crowley; that he gave Eager Bryan's address and suggested he get in touch with him; that the next day Eager reported he had talked with Bryan and that the price of the trains was $6200. Schachter denied telling Eager the trains were to come from Omaha and testified that he knew they were to come from Riverview Park. Eager admitted that on May 19, after his check was delivered, he and Schachter hired George Bowers to operate the trains, because Schachter had said Bowers knew all about them and had operated them at Riverview Park.

The testimony of Schachter, Bowers and Walter F. Driver, a manufacturer of show paraphernalia, discloses that when Eager arrived at the fair ground he refused to make payment until the trains were tested; that thereupon some of the track was laid, coal was procured by Eager and steam was raised; that two of the engines were in good condition and were run up and down the track; that Eager went away for a little while and upon his return delivered a check to Probasco, who drove away, and that neither Schachter nor Eager went with Probasco. Schachter testified that Eager told him he understood there was an arrangement with Maloney as to Schachter's part of the deal and that it was all right with him. Schachter denied making a check to Bryan or receiving any part of the purchase money or $300 for freight.

Bowers first installed the tracks adjacent to another concession constructed of inflammable material. The engines were tested and approved by the chief of the fire department of the fair, but on complaint of the owners of the adjacent concession the fair officials required the tracks to be moved to another location in the Midget Village. Bowers testified he moved them three or four times and was required to put them level with the ground. The

trains were in good condition and he did no work on them. Schachter paid his wages the first three weeks and after that Eager paid them.

On May 26 Eager and Schachter signed a contract providing that Eager should manage all the rides, finance their construction, receive all income "until his investment is completed," and thereafter the profits should be divided equally. The trains were operated only a short time and were stopped by the proprietors of the Midget Village on account of the failure of Eager and Schachter to procure liability insurance. During the time they operated the concessions they acted in concert in an effort to secure advertising on their trains, and it appears they would have secured very profitable contracts except for the fact that the final location of the tracks was not in view of the Midway. They also contemplated locating one of the trains on the municipal pier and made some inquiry to that end.

On September 13 Schachter assigned to Eager his interest in the contract with the Midget Village and Eager brought suit for damages in the superior court of Cook county against the village, alleging the erection of the rides and railroad, changes in the track to meet arbitrary requirements, and the village's refusal to allow a ballyhoo and turn-table to be placed in front of the building. The loss of $1500 per month profits was alleged. The complaint is verified by Eager. The allegation of the complaint as to anticipated profits does not comport with Eager's testimony that the trains could not be operated, nor does his statement that he was unable to see Schachter for several weeks after the purchase of the trains on May 19 agree with the fact that he had meetings with Schachter at least three times that month. The testimony tends to show that Schachter was as actively engaged as Eager in endeavoring to promote the success of the enterprise, and that it failed because of adverse conditions and not because of any defect in the equipment.

We have held that the purpose of the confidence game statute is to reach that class of offenders known as confidence men, who practice upon unwary victims swindling schemes as various as the mind of man is suggestive. As the name implies, the gist of the offense is the wrongful obtaining of the victim's confidence by some false representation or device. (*People* v. *Snyder,* 327 Ill. 402; *People* v. *Parker,* 356 id. 138.) A swindling operation not connected with the element of confidence fraudulently obtained for the purpose of the swindle does not constitute the crime of confidence game. (*People* v. *Rallo,* 293 Ill. 304; *People* v. *Santow,* id. 430.) There is here not only an entire absence of any testimony to show the essential element of the crime of confidence game—that of fraudulently obtaining the confidence of the victim—but the testimony affirmatively shows that the parties dealt at arm's length and that Eager acted upon his own judgment as to the value and condition of the equipment. If his testimony about the picture Schachter gave him is to be believed, it did not inspire his confidence but rather aroused his suspicion. He could not have been misled by it, because he saw the engines before he concluded his purchase. The evidence strongly tends to show he knew the trains were to come from Riverview Park and not from Omaha. He examined the three miniature rides before he gave Vogel his check, and insisted upon, and secured, a demonstration of the trains before he parted with his money. In each case he purchased upon his own judgment. The elements necessary to constitute the crime of confidence game are lacking.

The judgment of the criminal court is therefore reversed.

*Judgment reversed.*