(No. 32374.

The People of the State of Illinois, Defendant in Error, *vs.* Joseph G. Brand *et al.,* Plaintiffs in Error.

*Opinion filed May 20, 1953—Rehearing denied September 21, 1953.*

ARTHUR FRANKEL, of Chicago, (HERBERT M. WETZEL, of counsel,) for plaintiffs in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (ABBEY BLATTBERG, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, and ARTHUR MANNING, all of Chicago, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

Plaintiffs in error, Joseph G. Brand and Anton A. Morvay, whom we shall refer to as defendants, were found guilty by a jury in the criminal court of Cook County of the crime of obtaining money by use and means of a confidence game. They bring this cause here for review on writ of error assigning numerous errors in their trial.

The defendant Brand was president and principal stockholder of an Illinois corporation called Industrial Exchange, Inc., whose principal business was that of barter and exchange. The defendant Morvay was president of an Illinois corporation called Morvay & Company, which was apparently engaged in the construction business. Morvay & Company had offices at 39 S. La Salle Street, in Chicago, where it employed as many as twenty-five persons, including draftsmen who occupied a suite of offices in the same building but not adjacent to the general office of the corporation. Industrial Exchange, Inc., in June of 1949, had an office at 30 S. La Salle Street, Chicago, but some time thereafter moved into the same building as Morvay & Company.

The complaining witness, Herbert Bomar, a man of about thirty-five years of age, was employed by Brunswick Balke-Collender Company in the promotion department. In June, 1949, after conversations over the telephone, he called at Brand's office to discuss the sale to Brand of a lot he owned. The testimony as to which party first contacted the other is in direct conflict. Bomar testified that Mrs. Brand telephoned his wife and expressed a desire to buy the Bomar property. Brand testified that the situation was just the opposite. During the conversation Brand invited Bomar to accompany him to 39 S. La Salle Street to look at a suite of offices which he planned to move into. They stopped at the coffee shop in the building, and Brand introduced Bomar to the defendant Morvay. During the conversation which ensued Brand talked about a bowling alley building which he was going to build for Bomar to operate. However, Bomar stated that he was only interested in selling his lot. Brand inquired as to why Bomar did not build a home on his lot, and Bomar informed him the costs were too high.

Subsequent to that meeting, Bomar received a notice to vacate the apartment, in which his family lived, within sixty or ninety days. A few days later Brand called at Bomar's office with a book of plans and home designs, and stated that he could build a house for as little as $1000 down. Brand told Bomar to take the plans home and show them to his wife. The plans consisted of a printed book containing some eighty pages, entitled "Designs for Convenient Living," distributed by Home Planners, Inc., and had a price printed on the cover of the book of $1.50. The plan book can be purchased at various stores throughout the country.

Bomar and wife studied the book for several days, and on July 21, 1949, called at Brand's office, which was then located at 39 S. La Salle Street, where they met one Addison Brown, a Mr. Lauren and Brand. The Bomars told

Brand that they were interested in design No. 17 in the book of plans, and Brand sent for Morvay. Morvay came into the office with a cardboard model of design No. 17, and told them that the house would be constructed with lannen stone and would cost around $12,000 to construct on their lot. Bomar testified that he inquired of Morvay how they could build a house for that price, and that he was told that they owned their own rock quarry, their own mill and own lumberyard and had various trading powers by which they could get the materials cheaper than competitors. These statements were denied by the testimony of Brand, Brown and Lauren. Plans were shown to the Bomars and a few minor changes agreed upon. Contracts and papers were brought out and Morvay asked for a $4000 down payment. Brand spoke up and said·that the Bomars would only have to make a $1000 down payment, and that they could sign a note to him for $3000. Bomar wrote a check for $1000 payable to the Industrial Exchange, Inc., and gave it to Brand. Other papers were signed at this time, including a building contract, all of which were delivered to Brand. Within a day or two after the meeting other papers were forwarded to the Bomars by mail who signed them and returned them. They included a trust deed for $12,200, which was recorded in the recorder's office of Cook County, and a note in the sum of $3000 payable to Brand.

Bomar testified that Brand and Morvay both told him that the house would be started within a week or ten days and would be finished within four or five months, and Brand admitted that he told Bomar that the house would be started in October and completed by Christmas, 1949. When work was not started on the home by the latter part of July, Bomar made repeated calls to Brand and Morvay to find out when they were going to start, and received numerous excuses. Finally he went to the courthouse and discovered that none of the permits had been applied for,

and he himself obtained all of the necessary permits excepting a building permit. After two months had elapsed, Morvay finally told Bomar that Brand had never given him the $3000 for the second mortgage and that he needed that money before he could start. When Bomar confronted Brand with this he explained that he had a $3000 credit with Morvay & Company which he had acquired by paying some of their bills, and that he had assigned this credit to Bomar in exchange for the $3000 note, and suggested that Bomar see Morvay about it. On September 21, 1949, the Bomars called Morvay's office and met a Colonel Warren who stated that he had nothing to do with the transaction, but recommended that Bomar write out a check to Morvay for the $3000 and go ahead with the deal.

When Morvay came into the office he said, "Let's start over," and tore up the old contract and papers and had the Bomars sign a new building contract which called for a building to be commenced on October 1, 1949, on Bomar's lot and acknowledged receipt of a $4000 down payment, which included a $3000 check that the Bomars gave to Morvay on that date. The contract specified that the total price was to be $16,200, of which the $4000 down payment was a part, and the balance was to be paid by a $12,200 mortgage which was previously recorded. The Bomars insisted on and received a release from Brand of the $3000 note which they had previously executed and delivered to him. Morvay agreed to immediately start construction on the home, but even though building permits were finally obtained no work was done other than having the lot staked out.

In October, Bomar demanded that his money be refunded, and Morvay took Bomar to a builder whom he claimed was looking over the Morvay projects. The builder, however, denied this. Bomar was then taken to one Hicks, an employee of the Equitable Life Assurance Society, who told him that he was trying to arrange for a loan to handle

the papers of Morvay & Company. However, this was denied by Thomas J. Murray who testified that he was sales supervisor for residential mortgages for the states of Illinois and Wisconsin for the Equitable Life Assurance Society of the United States, and that the company would not finance the construction of a home, and further that James Hicks was employed by the company as a life insurance agent who worked on commission with one of the agencies in Chicago, and had no authority to make any commitments for mortgages. Subsequently, and before the trial of this case, Bomar received $500 from Morvay and $450 from Brand.

The defendants contend that they operated legitimate businesses as legitimate businessmen, and that they operated according to accepted business practice procedures, but that in the course of their business they became unable to meet their obligations and commitments.

Although the defendant Morvay elected to remain silent, the defendant Brand testified that he had been engaged in the business of barter and exchange which he explained was sometimes called reciprocity with various corporations. He further explained that his method of operation was to acquire a credit with some company by selling their produce for a commission consisting of the credit, and then in turn selling the credit which he had established to a third person who wished to do business with the original company. In the instant case, he established a credit with Morvay & Company by paying some indebtedness of the defendant Morvay and of one Donald Lynn, an officer of Morvay & Company, who is under indictment and is now a fugitive from justice. It was not established how a credit with Morvay & Company could be obtained by paying the indebtedness of two of the officers of the corporation. Brand further testified that he sold the complaining witness a $4000 credit with Morvay & Company on July 21, 1949, for which he received the sum of $1000 paid to him on

that date, and claimed that Bomar owed him the sum of $3000 until September 28, when he claimed to have first received the Bomar note. He contends that that indebtedness continued to exist until the note was paid at the time Bomar entered into a new contract with Morvay & Company.

Plaintiffs in error are represented in this review by other counsel than participated in the proceeding in the trial court, and throughout his brief and argument he has asserted that the failure to lay the proper foundation for our consideration of numerous points on review lay in the incompetency of the trial counsel. We have carefully examined the record and have reached the conclusion that defendants were ably represented by counsel of their own choosing. Counsel seems to have been familiar with the rules of evidence and the practice in criminal cases. The record was long. Many exhibits were introduced both in behalf of the prosecution and in behalf of the defendants. None of the alleged errors brought to our attention constitute reversible error. We cannot justify suspending the well-established rule of appellate practice of this court purely because their appellate counsel would have tried the case in the trial court in a different manner than the theory of defense advanced by the trial counsel.

In addition to the alleged incompetency of trial counsel, defendants contend that their failure to challenge the indictment in the trial court on the question of the constitutionality of sections 98 and 99 of division I of the Criminal Code (Ill. Rev. Stat. 1949, chap. 38, pars. 256-257,) should be waived for the reason that it would have been useless to there challenge the indictment since the trial court would have been bound by the previous decisions of this court which found them constitutionally sufficient. Nevertheless, they now assert that it is our duty to reconsider the previous decisions, because we might have failed in earlier decisions to have considered other bases on which the constitutionality of these sections might be attacked, and argue that by

virtue of our oaths of office we should hold unconstitutional that which is unconstitutional, irrespective of whether the question was saved for review. It is fundamental that the question of the constitutionality of a statute cannot be properly raised for the first time in a court of review, but must have been presented to the trial court and ruled upon by it, and the person challenging its validity must have preserved proper exceptions to such ruling. (*Mechanics' and Traders' Savings Assn.* v. *People ex rel. Auditor of Public Accounts,* 184 Ill. 129; *People* v. *McCoy,* 132 Ill. 138; *Chicago, Burlington and Quincy Railroad Co.* v. *City of Ottawa,* 165 Ill. 207; *Cummings* v. *People,* 211 Ill. 392.) It is a rule of universal application that the reversal of a judgment cannot be urged upon a ground not submitted to the trial court and upon which it did not and was not asked to decide. *Cummings* v. *People,* 211 Ill. 392.

It is contended that given instruction No. 2 was an abstract proposition of law that did not in any way make it applicable to the facts of the case; that it omitted specification of requirements, elements and definition of the crime, and that giving it constituted reversible error. The instruction is as follows: "The Court instructs the Jury that every person who shall obtain from any other person or persons any money, property or credit, by any means, instrument or device, commonly called the Confidence Game, shall be guilty of the crime of confidence game, and it is immaterial that such means, instrument or device takes the form of a business transaction." No one instruction must contain all of the law appertaining to the case. (*People* v. *Barnett,* 347 Ill. 127.) Given instructions Nos. 9 and 10 advised the jury of the proof necessary to convict and also the elements of the crime. Given instruction No. 2 was in the language of the statute, and was simply given to inform the jury generally as to the law of the case. It was not error to give the same. *People* v. *Crawford,* 278 Ill. 134.

Defendants contend that the refusal of the trial court to give certain instructions in their behalf constituted reversible error. We deem it unnecessary to set forth the text of the refused instructions, and consider it sufficient to state that we have considered the given instructions in connection with the court's refusal to give the others, and are of the opinion that the jury was adequately instructed as to the elements of the offense, their duties as jurors and of the weight of the evidence, and we are of the opinion that no reversible error was committed by the refusal to give the instructions.

Considerable evidence was introduced showing the commission of similar offenses by Brand and Morvay against one Ivan W. Brunk and against Harold F. Baker. It is not contested that evidence of prior similar offenses is competent to prove the criminal intent of one accused of violating the confidence game statutes. (*People* v. *Novotny,* 305 Ill. 549; *DuBois* v. *People,* 200 Ill. 157.) However, it is the contention of the defendants that the evidence relating to the Baker and Brunk cases is not admissible as against the defendant Brand inasmuch as there is no connection in the record between him and the other victims, and it is further contended that the evidence of those transactions is not admissible as against the defendant Morvay, as they claim that those offenses were committed subsequent to the offense against Bomar. The record discloses the date of the Baker transaction with Morvay to be August 16, 1949, and the date of the Brunk transaction to be September 16, 1949. Defendants argue that the date of the Bomar transaction with Morvay was the date that Morvay paid the money to Brand on July 21, 1949. We have repeatedly held that evidence of the commission of subsequent crimes is not admissible for the purpose of proving guilty knowledge or intent in the absence of proof that the defendant has formerly committed similar offenses, and that his intent in the commission of the first offense may not

be presumed from the commission of subsequent similar and distinct offenses. (*People* v. *Moshiek,* 323 Ill. 11; *People* v. *Hobbs,* 297 Ill. 399.) Inasmuch as Bomar paid money on July 21 and additional sums on September 21, 1949, the offense against him was not completed until the latter date, and, therefore, the Baker and Brunk cases were not subsequent offenses.

The admission of such evidence is subject to the limitation that it may be considered by the jury only in determining the intent of the accused. Defendants insist that the court had an affirmative duty to admonish or instruct the jury that consideration of the testimony as to those other offenses should be limited to the question of defendants' intent, and they also contend that the court should have instructed the jury that the evidence of the Baker and Brunk cases should be disregarded as far as the defendant Brand is concerned. No affirmative duty to admonish or instruct the jury attaches to the court because evidence of such nature is introduced, and the defendant having failed to invoke the ruling by exception or by request for admonition or instruction cannot now complain. *People* v. *Tilley,* 406 Ill. 398.

It is next contended by the defendants that the crime of obtaining money or property by means of the confidence game is undefined and not provable with the certainty required of crimes by its nature. The contrary has been repeatedly held ever since the enactment of the statute. No more certain definition could be given than that method of swindling called the confidence game. The means that may be used are different and varied, but that fact no more renders the statute uncertain than the different means employed to gain entrance to a building make burglary uncertain, or the various means by which death may be caused render the crime of murder uncertain. *People* v. *Bertsche,* 265 Ill. 272; *Morton* v. *People,* 47 Ill. 468; *Maxwell* v. *People,* 158 Ill. 248.

The defendants contend that the crime charged against them was not proved beyond all reasonable doubt and the *corpus delicti* was not proved. The confidence game has been defined as any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler. (*People* v. *Gair,* 379 Ill. 458.) The fact that the transaction was made to assume the form of a business deal is not material, if in fact it was a swindling operation. (*Chilson* v. *People,* 224 Ill. 535; *People* v. *Westrup,* 372 Ill. 517.) However, there may be a swindling in a business transaction without the person who is responsible for the swindling being guilty of operating the confidence game. Thus, where the confidence of the victim is honestly obtained through a course of regular business dealings, the confidence game statute is not violated. (*People* v. *Schachter,* 361 Ill. 573.) The confidence game statute was designed to reach a class of offenders known as "confidence men" who practice swindling schemes as various as the mind of man is suggestive. (*People* v. *Martin,* 372 Ill. 484.) The essence of the crime of obtaining property by means of the confidence game is a trust reposed in the swindler, and betrayed by him, as a means of obtaining the victim's property or money. The moving cause for the victim's parting with his money or property and giving it to the accused must be the confidence reposed in the accused. (*People* v. *Gallowich,* 283 Ill. 360.) There is no basis for the defendant's contention that there was a mere breach of an ordinary business contract honestly entered into with the parties under a dealing at arm's length. The confidence of the complaining witness was secured by the promise to build them a home at a low cost for a low down payment, furthered by the claim of ability to perform the contract with the statements that they controlled the sources of materials and could obtain them at a lower price than their competitors, and by the use of employees of legitimate

financial institutions to give the impression that these institutions were willing to support them. The intent to swindle on the part of Brand was evidenced by his selling to the complaining witness a purported credit with Morvay & Company, which he obtained by paying the bills of two of the officers of the company, and which he well knew at the time of the sale he could not recover from the corporation. The intent to swindle by the defendant Morvay was further evidenced by his failure to obtain building permits, or in any way attempt to carry out the terms of his contract, and by the fact that he must have known from the condition of his bank accounts, which were introduced in evidence, that he did not have the financial ability to carry out the terms of the contracts which he entered into with the complaining witness.

We are satisfied that there is sufficient evidence of the presence of the element of confidence and the betrayal of that confidence to justify the jury bringing in a verdict of guilty. When the evidence is clear and convincing, this court will not substitute its judgment for that of the jury.

It is urged by the defendants that the conduct of the jury in rendering its verdict in less than two hours after receiving its instructions in a case with as many exhibits and as long a record as the instant case is an indication that the jury did not consider all of the evidence after the case was referred to it, and thus the defendants were deprived of a trial by jury. There is no evidence in the record that the jury or any of its members violated their oaths as jurors, and in the absence of such evidence we must assume that they acted according to law. They contend that the form of the verdict which found the defendants "guilty of confidence game in the manner and form charged in the indictment" did not contain the essential element of the crime, and argue further that inasmuch as defendants were indicted under three counts, of which two

were *nolle prossed,* the jury did not know on what count it was finding the defendants guilty. There is no merit to their contention in this regard. The rule is that in determining the sufficiency of a judgment of conviction the entire record will be searched, and all parts of the record interpreted together, and a deficiency in one place may be cured by what appears in another. (*People* v. *Woods,* 393 Ill. 586; *People ex rel. Ewald* v. *Montgomery,* 377 Ill. 241; *People ex rel. Sammons* v. *Hill,* 345 Ill. 103.) The test of the sufficiency of a verdict is whether the jury's intention can be ascertained with reasonable certainty. (*People ex rel. Reed* v. *Williams,* 334 Ill. 241.) The law does not require specific repetition, and a verdict containing a reference to the allegations of an indictment is sufficient. (*People* v. *Norwitt,* 394 Ill. 553; *People* v. *Jensen,* 392 Ill. 72.) Looking to the evidence and instructions by which the issues were submitted to the jury, we must conclude that the jury was aware of the count upon which it found defendants guilty and that its verdict was sufficient to inform the court of its intention.

It is unnecessary for us to consider the contention that the State's Attorney's closing argument was prejudicial and replete with misstatement of law. No question as to the propriety of his argument was raised in the motion for a new trial. Points not set out in a motion for a new trial are waived. *People* v. *Vickers,* 326 Ill. 290.

The next contention of the defendants is that the proceedings were void because the criminal court of Cook County functioned without judges who were designated in accordance with section 26 of article VI of the constitution, and who had taken an oath to perform the duties of said court. We were called upon to decide this identical point in the case of *People* v. *Lindsay,* 412 Ill. 472, and there held that the method of assigning judges of the criminal court of Cook County pursuant to the rules of the court was constitutional, and that it was unnecessary for a judge

of the circuit court to take an additional oath as a judge of the criminal court. The present contention necessitates no further elaboration of that decision.

We have carefully considered the entire record in this case, as well as the arguments of counsel and the authorities cited by him, and we are of the opinion that the judgment of the criminal court of Cook County should be affirmed.

*Judgment affirmed.*