(No. 28237.—

THE PEOPLE OF THE STATE OF ILLINOIS; Defendant in Error, *vs.* DAVID A. MARMON *et al.*, Plaintiffs in Error.

*Opinion filed Nov. 22, 1944—Rehearing denied Jan. 16, 1945.*

20

ORR, VAIL, LEWIS & ORR, (WARREN H. ORR, and LOREN E. LEWIS, of counsel,) all of Chicago, for plaintiffs in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, of Chicago, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and CLEMENT D. CODY, all of Chicago, of counsel,) for the People.

Mr. CHIEF JUSTICE FULTON delivered the opinion of the court:

David A. Marmon, Charles Weiss and Nick Charles were indicted in the criminal court of Cook county for ob-

taining $500 of the goods, moneys and personal property of Harold J. Litz and Evelyn Litz by means and by use of the confidence game.

On February 28, 1944, after a hearing before the court without a jury, Marmon and Weiss were found guilty and Charles was acquitted. By writ of error Marmon and Weiss seek to review the judgment of conviction sentencing them to imprisonment in the Illinois State Penitentiary for a term of not less than one year nor more than three years.

On August 16, 1942, the complainant, Mrs. Evelyn Litz, together with her mother, her brother, John Klecan, and his wife, drove out to Westgate Homes subdivision, west of Chicago, in the village of Broadview and there talked to Nick Charles, a salesman, who asked them if they were interested in buying a home. After being told that the lots were being sold very fast and that a home could be built for her in the spring at a price of about $6000, Mrs. Litz paid a $5 deposit on lot 71 in the subdivision. On the same afternoon her husband accompanied her to the subdivision and a conversation was had with the defendant Marmon, who inquired as to Litz's employment and, when told he was a serviceman for Hurley Machine Company, Marmon stated that a house could be built for him very easily and Marmon could obtain priorities since Litz was in actual defense work; that the lot would cost him $1200, which would act as a deposit for the house, and that ninety days after the house was built, payments would start at $35 per month. Upon being told that the Litzes desired to pay cash, Marmon reduced the price $50, making a total for the lot the sum of $1150. Marmon then drove the Litzes around to look at some of the homes which had already been built, whereupon Mrs. Litz picked out a square type home as the kind and type she desired. Later in the same day Marmon called at the Litzes' home and picked up $1145, making the full purchase price for the lot, gave

the Litzes a receipt for the money and a contract of purchase, marked paid.

Nothing was heard from Marmon thereafter until March 12, 1943, although the Litzes had attempted to communicate with him on innumerable occasions and, as Mrs. Litz stated, as high as twenty-four times. On this date Marmon called Mrs. Litz and made an appointment for March 13, 1943, at which time he appeared at the home of the Litzes, together with Weiss, and told the Litzes it was impossible to obtain priorities since everything was frozen and since the lot was no good to the Litzes without a home being built thereon, they should try to get their money back and that he would be able to get their money back for them in thirty days if they would transfer the Westgate lot for a business lot in Golf View Gardens, which was at Morton Grove, Illinois. The Golf View lot, he said, was worth $2500, and he would let them have that lot for the Westgate Homes lot and an additional $500. Up to this time no deed had ever been tendered to the Litzes for the Westgate Homes lot. Marmon promised the Litzes that the Golf View Gardens lot would be sold in about two weeks, but definitely not more than thirty days and that it would be possible for the Litzes to secure a return not only of their investment but an additional profit of $300. A representation was made that practically everything was sold in the Golf View Gardens subdivision at that time and attention was called likewise to the fact that the Klecans had a similar deal.

The Litzes advised Marmon they could not get $500 together at once but gave Weiss $300 the next day at their home, Weiss giving them in return a contract for the purchase of lot 22 in block 9 of Golf View Gardens and taking back an assignment of lot 71 in Westgate Homes subdivision. Two days later Mr. and Mrs. Litz gave Weiss $200 more. Mrs. Litz testified that the contract for the Golf View Gardens lot, at the time their signatures were

affixed, was in blank, Marmon saying that doing so would save considerable time. Upon receiving the contract, Mrs. Litz inquired of Weiss as to the $10 monthly payment clause contained in the contract which had never been discussed with her theretofore. Weiss told her that the $10 monthly payments were included only to make the contract look legal and that she would never have to make the payments since the lot would be sold before any payments came due. Both Marmon and Weiss were present at the time the contract was signed. At that time the title to the Golf View subdivision was in one Harold W. Arnum.

Thereafter nothing was heard from Marmon or Weiss, although repeated calls were made to them, until in August, 1943, when Litz and his brother-in-law, John Klecan, went to the Chicago office of the defendants and inquired as to when the deal could be cleared up since Litz was going in the army in two weeks. Marmon promised him that if the deal for the Golf View Gardens lot was not completed within two weeks, the $500 paid by Litz would be refunded and the Litzes would be placed back on the lot in the Westgate Homes subdivision. Marmon never returned the $500 to the Litzes nor did he redeliver the Westgate Homes lot to them, nor did he give them a deed to the Golf View lot.

On February 13, 1944, more than two months after the return of the indictment and just before the commencement of the trial, the Litzes were in receipt of a letter signed by the West Shore Lake Estates, with whom they had never had any business, signifying that a deed to the Golf View Gardens lot was ready for delivery to them.

The Litzes testified they had confidence in the statements made by Marmon to them as to the availability of priorities for the building of their home and that they did not understand they were just buying a lot but were buying a lot and making a payment on a home, although they knew that the contracts only stated that a lot was purchased by them; that when Marmon talked to them about the un-

availability of priorities and the prospect of getting their money back, they had confidence in him on that deal and because of that confidence invested additional moneys in the Golf View Gardens lot without ever seeing the lot, relying entirely upon the promises and statements of Marmon; that they had full confidence in Marmon and believed what he told them; that he was a smooth conversationalist.

It appeared from testimony given by Esther Anderson that on May 14, 1942, prior to the original Litz transaction, Marmon knew that he could not build a home for the Litzes, since at that time he drew up a statement for Mrs. Anderson to sign that she understood no home would be built on the lot purchased by her, due to the lack of priorities.

It further appeared from the testimony of George Leoni that in August of 1943, about the time Harold Litz and his brother-in-law called at the defendant's Chicago office and were informed by Marmon that he would give Litz back his $500 and place him back on the Westgate Homes lot in case the Golf View Gardens lot deal did not go through within two weeks, Leoni had made a deal for the same Westgate Homes lot originally purchased by the Litzes and was promised a lot and home for $6000 upon a down pay-ment of $750, the home to be completed by May of 1944.

According to the testimony of Harold W. Arnum, who owned the Golf View Gardens subdivision, Marmon and Weiss had an option under date of October, 1942, whereby they were required to purchase and pay for five lots in the Golf View Gardens subdivision every thirty days. The price of the lot purchased by Litz was designated at $50, subject to unpaid taxes, special assessments and restrictions of record. No notice was received by Arnum that the Litzes had purchased one of the lots and no effort was made to acquire title to the lot until more than a month after the indictment was returned against the defendant.

Arnum was not requested to issue any deeds until after the defendants had been indicted. The Golf View Gardens

lot under contract to the Litzes had by Arnum been conveyed to a man by the name of Jano as security for a loan.

The testimony of a good number of witnesses was offered by the State of purportedly similar transactions for the purpose of showing intent to defraud. To some of these the defendants objected.

Substantially the same procedure was followed by the defendants in obtaining money from John Klecan and his wife. Klecan corroborated the testimony of Mrs. Litz on her first visit to the Westgate Homes subdivision. On the same occasion the Klecans picked out lot 73 of block 23 and were told by Charles, the salesman, that a home could be built for them; that $700 could be paid on the lot and the balance of $500 could be paid in monthly installments. Marmon thereupon took over the deal and upon learning that Klecan was a tool and die maker told him he had nothing to worry about, that he would have a home in no time at all; that he had fifty priorities coming through and a five or six-room house would be built for them for $6000 and plans would be drawn for them by his architect. Some discussion was had as to the type of the home. A $50 discount was given to the Klecans for cash which was paid in full on August 15, 1942, the contract being so marked. No deed was tendered to the Klecans after the lot had been paid for. There was considerable difficulty in communicating with Marmon although on several occasions Mrs. Klecan succeeded in talking to him and was told that the priorities would come through almost any time. About November 20, Marmon telephoned and asked the Klecans to come to the office; that he had a proposition to make to them. The same story was repeated as in the Litz incident as to the unavailability of priorities and the wisdom of attempting to get their money out of the Westgate Homes property by transferring to a lot in Golf View Gardens which was worth $2500, but which could be picked up for $1400; that the Golf View Gardens lot would be

sold within a few weeks, and, at most, thirty to forty-five days thereafter, with a profit to both parties. The Klecans testified that Marmon was a very smooth talker and that they immediately had a great amount of confidence in him; that they did not go out to look at the Golf View Gardens lot but agreed to transfer to same and paid Marmon the additional amount of $200 over and above the Westgate Homes lot and received in return a contract for the purchase of lot 29 in block 8 of Golf View Gardens. The contract as drawn called for an additional cash payment of .$839 over and above the Westgate Homes lot but Marmon stated that the additional $639 above the $200 cash payment would never have to be paid since the lot would be sold before any of the amounts became due. About January 21, 1943, Marmon and Weiss both informed the Klecans that Weiss had sold the Golf View Gardens lot for $3150 and, when they arrived at the defendants' office, the Klecans were told that Weiss would get a $200 commission out of the deal and that they would have to pay up the rest of the $639 so that Marmon could get a clear title to the property, as the man who had bought the lot had to make a loan for the purchase thereof and would have to have a clear title exhibited for the purpose of the loan. After expressing their inability to obtain all of the money, Weiss came out to their home and told the Klecans that he would accept $539, which was all they could raise, and would personally put up the other $100 out of his own pocket to make up the required payment. After this, neither Weiss nor Marmon was seen or heard from until Klecan accompanied Litz to Marmon's office in March of 1943. On this occasion Weiss denied all knowledge of the Golf View Gardens transaction and said that Marmon would have to be seen about it. He also told the same thing to Litz. Neither a deed to the Westgate Homes lot nor the Golf View Gardens lot was ever received by the Klecans until after the indictment of the defendants, nor was any money

returned to them. During the pendency of the Westgate Homes transaction, the Klecans were always under the impression they were purchasing a home and not just a lot, upon which payment was made. The Klecans had an abiding faith in what they were told by Marmon throughout all of their transactions with him.

The testimony of Clarence E. and Mildred B. Willms was offered by the prosecution to show a similar offense. About June 28, 1942, the Willmses, in much the same manner as the Litzes and the Klecans, made a purchase of a lot in Westgate Homes subdivision. Marmon and Charles both promised them a home by the spring of 1943 or their money would be refunded; that Marmon had the necessary priorities. A discussion was had as to the type of home which was to consist of five or six rooms and bath, costing $6000 to $6500 to be financed by the FHA. By September 29, 1942, they had paid their contract of purchase in full and thereafter attempted to communicate with Marmon on numerous occasions. As in the Litz transaction, on or about November 11, 1942, Marmon called the Willmses and asked them to come to his office. Upon arriving they were informed that the priorities, which he had assured them he could get, had not come through and it was proposed that they transfer their lot to a lot in the Golf View Gardens subdivision which was worth $2500, but which he could get for them for $1900; that they would get full credit for the purchase price of the Westgate Homes lot and that the trade would cost nothing additional; that although the contract provided for payments of $5 per month, those payments would not have to be made. In January of 1943, Marmon called the Willmses to the office and informed them that the proposition he had for the business lot was going through and that if additional money could be raised so a clear title could be procured on the lot, the Willmses would obtain a profit of approximately $600. When informed that the Willmses could not

obtain the $700 balance, Marmon said that if they could raise $344 he would put the rest of the money in out of his own pocket, whereupon the Willmses signed a note in that amount, due the day following. Weiss called at their home in a day or so and collected the amount of the note. After waiting for a period of time and having heard nothing from Marmon or Weiss, Willms called Marmon but could never find him in. The Willmses never received a deed nor the return of their money which was promised to them by Marmon. Until the last, both of the Willmses maintained strict confidence in Marmon, he having been exceedingly nice to them, nor did they ever go out and look at the Golf View Gardens lot since they had implicit confidence in what Marmon had told them. The Willmses had such confidence in Marmon that they testified it made no difference what was in the pieces of paper they signed since his propositions sounded good and they believed in him.

The testimony of Nicholas Gruenzig was offered, over objection, to verify the means and manner Marmon had of obtaining sale of his Westgate Homes lots and the intent therein. In August, 1943, subsequent to the time that the defendants had induced Willms to transfer from Westgate Homes to Golf View Gardens for the reason that priorities could not be obtained, Marmon obtained $1250 from Gruenzig for the sale of the same lot originally purchased by Willms on the representation that a home would be built for Gruenzig within ninety days and would be completed by November 1 or December 1, 1943; that all necessary priorities were had and the price of the home was to be $6500. Two days later Gruenzig was asked to come over to Marmon's office to sign a contract and when Gruenzig saw the contract was only for a lot and said nothing about a house he refused to sign. Gruenzig never received a deed to his lot nor any of his money back.

The testimony of seven or eight additional witnesses was offered, some over the objection of the defendants, to prove

the commission of similar offenses and intent on the part of the defendants, in one of which, after Marmon had induced the purchaser to switch from one lot to another and to place additional funds into the transaction without the knowledge of her husband and who, upon becoming suspicious, said she was going to get a lawyer, Weiss replied, "Do what you damn please."

Frank J. Mancel, an attorney, testified that the Klecans had authorized him to write a letter to the defendants demanding a deed and guarantee policy for the Golf View Gardens lot. The only other testimony submitted by the defendants was that of Marmon, who testified in his own behalf and denied that he made any promises to build for any of the witnesses testifying for the prosecution or that he ever represented that he could obtain priorities for homes; that he did not call on the Litzes for the purpose of trading them into a lot in Golf View Gardens but called only to have a friendly chat with them; that he made no representation that the Golf View Gardens lot would be sold in a short time or that he could put them back on the Westgate Homes lots if the Golf View Gardens lot did not materialize; that although he promised to refund $500 to Litz upon his going to the army, he did not have the money at the time; that he could have delivered a deed to any parcel he sold in Golf View Gardens at any time and did not deliver a deed on the day he closed the deal with the Klecans and Litzes because he felt that he could deliver a deed at any time he desired; that although he sold the same lot to both Mrs. Anderson and to a Mr. Fox, he gave Fox back his money when the trial started.

The defendants, plaintiffs in error here, contend that the evidence in the record does not present a case justifying a conviction of the crime of confidence game as defined in section 98 of the Criminal Code; that the evidence fails to show the required proof of fraudulent motives and acts when the defendants first bargained with Mr. and Mrs.

Litz. It is contended that the prosecuting witnesses bought a lot in Westgate Homes subdivision with their eyes open and without deception or fraud being practiced upon them to obtain their confidence; that after they found that they could not procure priorities to build their own home, they realized that a piece of property was useless to them until after the war, and willingly, again dealing at arm's length with the defendants, agreed to exchange their original residence lot for a business lot in Golf View Gardens, paying additional cash therefor; that no trick, device or artifice was used to gain a parting of the complaining witnesses and their money; that they were not tricked nor have the complaining witnesses ever complained that the price paid for the lots was too high; that the defendants were denied a fair trial and were prejudiced by the introduction in evidence of many wholly unrelated transactions for the alleged purpose of proving the defendants had guilty knowledge in the transaction for which they were on trial.

The confidence game has been defined as any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler. (*People* v. *Gair*, 379 Ill. 458.) The fact that the transaction was made to assume the form of a business deal is not material, if in fact it was a swindling operation. (*Chilson* v. *People*, 224 Ill. 535; *People* v. *Westrup*, 372 Ill. 517; *Maxwell* v. *People*, 158 Ill. 248; *People* v. *Depew*, 237 Ill. 574; *People* v. *Keyes*, 269 Ill. 173.) However, there may be swindling in a business transaction without the person who is responsible for the swindling being guilty of operating the confidence game. Thus, where the confidence of the victim is honestly obtained through a course of regular business dealings the confidence game statute is not violated. *People* v. *Schachter*, 361 Ill. 573.

The confidence game statute was designed to reach a class of offenders known as "confidence men" who practice swindling schemes as various as the mind of man is

suggestive, upon unwary victims. (*People* v. *Martin,* 372 Ill. 484.) It covers any scheme whereby the swindler wins the confidence of his victim and then swindles him of his property or money by taking advantage of the confidence fraudulently obtained. (*People* v. *Peers,* 307 Ill. 539.) But a swindling operation does not constitute the confidence game unless the element of confidence is present. It has been held not enough to show there has been an obtaining of money by false pretenses which, broadly stated, has been defined as any designed misrepresentation of an existing condition by which a party obtains goods of another. *People* v. *Peers,* 307 Ill. 539.) The essence of the crime of obtaining property by means of the confidence game is a trust reposed in the swindler, and betrayed by him, as a means of obtaining the victim's property or money. The moving cause for the victim's parting with his money or property and giving it to the accused must be the confidence reposed in the accused. *People* v. *Gallowich,* 283 Ill. 360.

The plaintiffs in error vehemently contend that any property obtained by them was by means other than fraudulently obtaining the confidence of the victim and that there is no evidence whatever that any false representations were made to secure the confidence of Mr. and Mrs. Litz or of any of the other numerous witnesses who testified for the State. In this connection, it is well to bear in mind that in the Litz transaction, and in each of the other transactions, the plaintiffs in error stated they had priorities for a home and would build a home for each of the witnesses within a very short time. To some it was said a home would be built within ninety days. In the Litz, Klecan and Willms transactions the impression was left that the payment of the Westgate Homes lot was not merely the payment for a lot, but likewise the down payment on the cost of a home which was to be financed by the FHA or some other financing agency.

When no priorities were forthcoming, which the plaintiffs in error knew could not be forthcoming, since two months prior to the Litz transaction Marmon had already told Mrs. Anderson that priorities could not be secured, a set scheme or plan was devised whereby additional moneys were received from the gullible parties on the pretext that an unusual business lot, which was to cost plaintiffs in error $50 plus unpaid taxes and special assessments, could be sold for the benefit of complaining witnesses in order to obtain the return of their money and a profit. They represented that the business lots had a value of $2500, but for some reason unexplainable could be picked up for an amount considerably less. In the Litz case, a false promise of resale and exchange was made, together with the promise to have the original investment of the parties back in their hands within thirty to forty-five days. By this means, as much money as physically possible was extracted from the unwary victims, which money they never saw again and for which they never obtained or received a deed at any time until after the indictment of the plaintiffs in error. One may well ask the question as to why, when the Westgate Homes lots and the Golf View Gardens lots were paid in full, deeds were not transferred to the parties entitled thereto. The intent and motive of plaintiffs in error is shown not only by what occurred in one remote transaction but also in the vast majority of similar cases testified to by witnesses for the State. Marmon's statement that he originally called on the Litzes after being unable to obtain priorities merely for a chat and not for the sole purpose of effecting an exchange of the Westgate Homes lot for the Golf View Gardens lot fails to carry with it the ring of veracity, in view of the general plan followed by him.

That the Litzes had implicit confidence in Marmon and Weiss is exemplified not only by their testimony in which they state positively that they had implicit confidence in Marmon, but is manifested by the circumstances in which

they signed contracts in blank, paid money over without receiving contracts, entered into the Golf View Gardens lot purchase without a view of the property, allowed the contracts to stand paid in full without delivery of deed, patiently waited for Marmon to keep his many and varied promises, and then, even after Marmon had told them that the monthly payments under the Golf View Gardens contract would not have to be made, raised additional cash for the purpose of providing a clear title, believing that this was apparently the only obstacle in the path of getting back their money.

The plaintiffs in error concede that the Litzes were relying on Marmon, but earnestly contend that no fraudulent scheme or device caused them to do so. With this contention we find it very difficult to agree. Marmon's promis to pay the $500 back to Litz at the time he was entering the army, and the further promise to place him back on the Westgate Homes lot if the Golf View Gardens transaction did not terminate successfully, are indicative of the plan and scheme of Marmon throughout, in which Weiss was a ready and willing coconspirator. Marmon knew that he had already sold the Litzs' Westgate Homes lot to another party, making it impossible for him to comply with his agreement with Litz. Marmon's only excuse for his acts is that he was a little short of money, and, therefore, did not pick up deeds to the lots from Arnum, although he could have at any time he so desired.

While it is true that Marmon, together with Weiss, had been engaged in the legitimate business of a real-estate broker, it is apparent that as to the Litzes, and the other witnesses who testified, he never had any intention of complying with the contracts or promises made and his only purpose was to secure the money of his victims and then let the future take care of itself.

There is no basis for the plaintiffs in error's contention that there was a mere breach of an ordinary business con-

tract honestly entered into with the parties under a dealing at arm's length. The confidence of the complaining witnesses was secured first by the promise of a home and then by promise of the return of their money within a short time with a profit attached thereto, which is an ever-appealing argument to which the unwary are usually susceptible. If the contracts with the Litzes had been entered into in good faith with the full intention of keeping them, then the contention that the conduct of Marmon and Weiss was merely a breach of an ordinary contract would be conclusive. We are satisfied that the evidence shows the taking advantage of the confidence reposed in plaintiffs in error by the Litzes and the resultant defrauding them of their money by a swindling scheme, and it is immaterial that the scheme took the form of an ordinary business transaction. It is difficult to determine how a careful reading of the evidence would lead to any other conclusion.

To the contention of the plaintiffs in error that the court erred in admitting evidence of other transactions because the other transactions were not similar offenses, it may be said that it is proper to prove that other persons had been defrauded by the same confidence scheme by which money was obtained from the Litzes for the purpose of showing guilty knowledge and intent. *People* v. *Shaw*, 300 Ill. 451; *People* v. *Weil*, 244 Ill. 176; *DuBois* v. *People*, 200 Ill. 157; *People* v. *Depew*, 237 Ill. 574.

Although the trial court may improperly have allowed evidence of transactions somewhat dissimilar from the Litz transaction, the plaintiffs in error were proved guilty beyond any reasonable doubt and error, if any was committed, would not be sufficient to reverse the judgment. No substantial defense was offered by the plaintiffs in error, Weiss not testifying at all, and this court will not reverse an obviously correct judgment for the mere purpose of trying to produce a better record. *People* v. *Westrup*, 372 Ill. 517.

*Judgment affirmed.*