(No. 32518.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PAUL J. GLENN *et al.*, Plaintiffs in Error.

*Opinion filed March 23, 1953—Rehearing denied May 18, 1953.*

Eugene W. Wood, and Anthony B. Beasley, both of Chicago, (George N. Leighton, of counsel,) for plaintiffs in error.

Ivan A. Elliott, Attorney General, of Springfield, and John S. Boyle, State's Attorney, of Chicago, (John T. Gallagher, Rudolph L. Janega, Arthur F. Manning, William J. McGah, Jr., and Joseph J. Attwell, Jr., all of Chicago, of counsel,) for the People.

Mr. Justice Bristow delivered the opinion of the court:

Defendants Paul J. Glenn and Harvey C. Summers, on writ of error, seek a review of a judgment of the criminal court of Cook County, entered in a trial without a jury, finding defendants guilty of violating the confidence game statute, (Ill. Rev. Stat. 1951, chap. 38, par. 256,) whereupon each received a sentence of two to seven years in the Illinois penitentiary.

The essential inquiry presented is whether the evidence established that defendants were guilty of the crime of operating a confidence game in violation of the statute. Other specific issues interposed by defendants include the

assertion that the trial court erred in admitting proof of other transactions; that the People did not prove that both defendants participated in the offense; that the length of time over which the trial extended amounted to a denial of a fair trial; that the court failed to consider evidence of defendants' good reputation; and that the prosecutor denied defendants a fair trial by referring to other indictments pending against them.

The record is voluminous, and it would unreasonably prolong this opinion to attempt even to summarize the testimony of all the witnesses. Therefore, we shall confine our analysis to reviewing the evidence pertaining to the Dotson transaction, which was the basis for the indictment, and shall allude summarily to the transactions with other persons both prior to and following the Dotson case, insofar as they directly affect the charge against defendants.

During the early part of July, 1950, Lonnie Dotson and his wife noted in the *Chicago Defender,* a Chicago newspaper, a quarter page advertisement in bold type presented by the First Apartments Corporation, urging persons who wished to live decently and get out of single rooms into four-room apartments with modern conveniences and reasonable rentals of about $50 a month to telephone a designated number, or secure an application at their offices at 6455 Cottage Grove Avenue. Included in the advertisement were pictures of the exterior and interior of an attractive apartment building.

The Dotsons telephoned the number listed and shortly thereafter received an application blank headed Apartment Owners Inc., soliciting information regarding their financial status and apartment requirements, which they mailed to the office on Cottage Grove Avenue. They received a notice to appear at the office several days later, and were directed to defendant Glenn, who had their application before him. He proceeded to show the Dotsons pictures of buildings, and, when Dotson said that he liked one,

Glenn stated, "This is one of our buildings." He explained that it was located at 947 Hyde Park Blvd., and that it would cost the Dotsons $500 to get an apartment in that building, from which sum two months rent, at $75 a month, would be deducted, and the balance repaid within twelve months with 3% interest. Glenn further explained that if he did not get the apartment for the Dotsons within 90 days he would return their money with 3% interest.

At Glenn's suggestion the Dotsons met him that same afternoon at the Hyde Park building, and while he was showing them an apartment purportedly similar to one he could obtain for them in ninety days, he remarked, "Mr. Dotson, you know that I would not have a key to this building if I did not own it." The building, however, was owned by Mrs. Sarah Russo and her husband. They had no agreement with defendants to sell it, and although there had been some discussion of a sale several months before, the Russos had rejected defendants' offer and returned defendant Glenn's worthless check. However, in April 1950, Glenn gave Mrs. Russo another check for $300 just to keep apartments vacant. When that check was returned for insufficient funds defendant Summers paid the obligation, and pursuant to their arrangement Mrs. Russo kept apartments in that building vacant from March until some time in September, and gave Glenn keys to three or four apartments, even though he neither had an interest in the building, nor the right to rent these apartments.

Defendants, without alluding to these arrangements existing at the time the apartment was shown to the Dotsons, endeavored to explain the lack of ownership on the ground that some broker would not get them a mortgage, and Mrs. Russo subsequently refused to sell the building because prejudice developed after a woman was attacked there.

Dotson gave Glenn a cashier's check for $400 dated July 21, 1952, payable to the First Apartments Corpora-

tion. Glenn indorsed it, and he and Summers gave it to Lester Antler in payment for keeping apartments vacant for them at 812-822 E. 46th Street. Thus the Dotsons' check was utilized by both defendants in their joint venture in that building.

The Dotsons were given a contract and corporate note signed by Glenn as vice-president of First Apartments Corporation, under which the corporation was obliged to obtain a dwelling satisfactory to the Dotsons within ninety days and to return $500 within seven days after receipt of written notice of termination of the contract. The words "Paid, $400. 7-22-50. Balance due before occupancy" were written on the contract. A corporate seal was affixed to the contract which Dotson testified made him feel assured of getting his money back. At the time these instruments were executed, however, two of the bank accounts used by defendants for the corporations were overdrawn, and a third which had a balance of $85.51 was overdrawn immediately thereafter. Moreover, the First Apartments Corporation, according to their own admissions, owed more than $52,000 from similar transactions with some 150 people, who had paid money to defendants in return for corporate notes and promises of apartments.

On September 9, 1950, Dotson gave Glenn $100 in cash which was noted upon the contract. In response to Dotson's query of how soon he would get an apartment, Glenn assured him that it would be within the next few days, and stated, "We are doing some work over there, and we have to get somebody in the place because we are getting too many vacants, and we are paying out money and nothing coming in." According to Dotson's testimony, the reference to "we" reassured him that Glenn or the corporation owned the building and that he would get an apartment shortly. This belief was further enhanced by the fact that the building was in fact being sandblasted, but by the

actual owners, the Russos. Notwithstanding the facts, Mrs. Summers and others employed in the office told people that they were having the building sandblasted.

The Dotsons waited until just before Christmas, 1950, and then telephoned Glenn and informed him that they had to move by the first of the year. He reassured them that he would have something for them in a few days, but explained he could not place them in the Hyde Park building, but would place them in a building on 46th Street, and move them to the Hyde Park building later. Nothing further was done pursuant to that plan.

During the early part of January, 1951, Mrs. Dotson made numerous telephone calls to Glenn, and went to his office about five times, asking for a refund of the $500. Glenn stated that he had no money, and insisted that she give him a seven-day written notice, which she did on January 22, 1951. At the expiration of the seven days, when Dotson demanded his money back, Glenn claimed that he had none. In response to Dotson's inquiry about the place on 46th Street, Glenn said that he had turned it over to Summers and did not know whether it was available. Summers was in the office at the time and explained that he was not sure about that apartment because the man's wife was ill, but if it was available, another $300 would have to be paid.

The Dotsons heard nothing further from Glenn or Summers with reference to any apartment, and no part of their $500 was ever returned.

Notwithstanding the lack of funds, the defendants paid to the *Chicago Defender* some $3,936.73 for continuous advertising similar to that which attracted the Dotsons to their offices. Summers handled all of the advertising and hired all the people who worked for the corporation. He had the title of president of the First Apartments Corporation, which he incorporated in 1946, and he incorporated Apartments Owners Inc., in February, 1950. He and Glenn

were the sole managers of the corporations and jointly held complete control of the corporate affairs.

Evidence was further adduced that although defendants promised to secure apartments in the Hyde Park building and in some five other buildings for numerous persons who gave defendants large sums of money, neither defendants nor their corporations owned any of those particular buildings, nor even had an interest in them, nor were a party to any contract which had any of those buildings as the subject matter. At the time the Dotson contract was executed, defendants had lost whatever interest they had in other buildings purchased from funds given them by persons who sought apartments, and were merely paying owners to keep apartments vacant for them to show. They had no source of income from any property; in fact, they did not even own the furniture in their attractive offices on Cottage Grove Avenue.

From the testimony of some fifteen witnesses, extensive evidence was submitted of transactions following the same pattern as the Dotson case: Applicants coming to the office pursuant to the ad in the *Chicago Defender*; defendants showing them vacant apartments in buildings in which they had no interest or right to rent, but nevertheless creating the impression of ownership either by direct statement to that effect or by unmistakable inferences; promises for an apartment in return for the payment of certain sums of money, with the proviso that the money would be refunded if no apartments were procured; the delivery of money to defendants by the applicants in reliance upon defendants' representations; the formal execution of corporate notes and contracts; the prolonged stalling and eventual loss of money without the delivery of any apartments.

In one instance Summers secured a second $300 from an applicant by going to his place of business and telling him that an apartment was available in a building different

from the one in which the applicant had been promised an apartment, but that it was necessary to have an additional $300 to repay the "man ahead of him." The applicant made a second payment, but received neither the apartment, nor the return of any part of the $600 he paid to Summers.

The People adduced evidence that Summers admitted that applicants putting up less than $1000 did not even have a chance at an apartment, and also stated, that he put $38,000 into a building which had never even been for sale.

Defendants continued their transactions even after criminal proceedings had been commenced against them. In January, 1951, defendant Summers sent many of the corporate-note holders a letter stating that defendants had the same interest in the various buildings which they always had, and that, "the recent and present program of refinancing will tie our equities in such a way that the buildings cannot be lost except through outside interference." The letter further requested the recipient not to make a complaint to the State's Attorney's office, but to waive their right to sue on the note.

Even while the trial was in progress, defendants, through one of their employees, one J. Pierpont Morgan, whose job was to smooth relations between applicants and the corporation, induced an applicant to part with $400 in order to get an apartment.

In the light of the foregoing evidence the criminal court of Cook County found defendants guilty of the crime of violating the confidence game statute as charged in the indictment.

Here, the defendants contend that they honestly entered into a business agreement with Dotson which they could not perform because of financial difficulties caused partly by the State's Attorney's investigation of their affairs, and partly by their lack of good business judgment.

The People, however, advance the theory that defendants fraudulently obtained the confidence of Lonnie Dotson by false representations and fraudulently induced him to enter into an agreement which they had no intention of performing, and then abused that confidence by defrauding him of $500.

The essence of the crime of obtaining money by means of the "confidence game," (Ill. Rev. Stat. 1951, chap. 38, par. 256,) is that trust or confidence, obtained by some fraudulent scheme or device, is betrayed after money or property has been obtained from the victim. (*People* v. *Shepard,* 358 Ill. 338; *People* v. *Burley,* 357 Ill. 584.) Such a scheme may be a confidence game even though it takes the form of a lawful business transaction or a valid contract. *People* v. *Burley,* 357 Ill. 584; *Chilson* v. *People,* 224 Ill. 535.

In support of their contention that they were engaged in a legitimate business enterprise in which they were merely inept, defendants state that they were incorporated, had offices at 6455 Cottage Grove Avenue, where they were available for contact, paid large sums of money for advertising, had interests in several large buildings, and had collected $135,000 from 479 persons and performed 65 per cent of their accounts. They urge that Lonnie Dotson did not really rely upon what defendant Glenn told him, but made some sort of independent investigations and relied upon the reassuring things other applicants stated about defendants, and that they could not perform their agreement with him because Mrs. Russo unexpectedly decided not to sell the property because of prejudice developing after a woman was raped in the building.

In evaluating these assertions in the light of all the evidence, it is patent that the use of a corporate device would not legitimatize a confidence game, nor would the mere availability of the participants at a place of business. The attractive furniture, which did not belong to either

the defendants or the corporations, was more of a lure to prospective "home seekers" than an indicia of legitimate enterprise, since it suggested affluence and prosperity which neither the defendants nor their corporations enjoyed. On the day the Dotson contract was executed the corporation owed, by defendants' own admission, over $52,000 to some 150 persons, and two of its bank accounts were overdrawn, with $85 temporarily left in the third account. Notwithstanding this financial condition, the First Apartments Corporation continued to sign notes and contracts, and to incur obligations, and did pay out almost $4000 for advertising during 1950 to lure more people to their office where they could be induced to pay money for apartments which could not be delivered, and which, according to Summers' admission in one conversation, the people did not have a chance to get. The payment of these huge advertising expenses under these circumstances, instead of reflecting the legitimacy of defendants' operations, suggests a fraudulent purpose.

The claim of legitimacy of defendants' business is further rebutted by the overwhelming evidence of defendants' promises to secure apartments for persons in the Hyde Park Building, and in other buildings which defendants neither owned, nor had the right to rent, but merely pretended to own, by showing vacant apartments which they maintained by paying specified sums to the owners. Moreover, in other instances where defendants had actually owned an interest in the building, they continued the pretense of ownership even after they lost their interest. In August, 1949, Summers and Glenn assumed a mortgage on the property at 6625-27 Drexel, but were immediately in default on this obligation, and, although they collected all the rents, before July, 1950, they were in default more than $3000 and eventually assigned their interest. Nevertheless, defendants continued thereafter to promise persons

apartments in the building, and induced them to part with their money by showing them Summers' own apartment.

It is significant that even when defendants did have apartments available for rental, instead of giving them to the persons to whom the apartments were promised, defendants merely kept the apartments vacant for months, as in the case of the building at 812-822 E. 49th Street, in which they had an interest for a short time, in order to impress prospective victims that defendants could procure apartments. Thus, it is evident that whether defendants could or could not obtain apartments made no difference, since the victims had no chance either to get the apartments or the return of their money, despite all the legal window dressing of contracts under corporate seal and corporate notes.

Furthermore, there is no suggestion of legitimacy in defendants' letter to the holders of their corporate notes in which the people were asked to waive their claims on the basis of the legal double talk that defendants still owned the same interest in buildings that they always had, and that "the present refinancing program would tie our equities in such a way that the buildings could not be lost except through outside interference." Nor do the activities of defendants' employee, J. Pierpont Morgan, in procuring $400 from an applicant for an apartment during a court holiday while defendants were on trial, suggest that defendants were merely inept businessmen.

The contention that the interference of the State's Attorney's office was responsible for the inability of defendants to perform their agreements is entirely without foundation in fact, and cannot have been seriously urged. The evidence of the operations of the Department of Frauds and Complaints within the State's Attorney's office, which handled this cause, reveals that after numerous complaints against defendants' machinations were received during 1949

the Department urged defendants, in private, to make settlements; and in August, 1950, when there were about ten to fifteen complaints against defendants, they were again privately warned not to take money from one person to pay another. Nevertheless, defendants persisted in their conduct, and by October, 1950, when there were about thirty complaints on file, the case was first assigned for outside investigation. As hereinbefore noted, defendants had been overdrawn in their accounts and had lost whatever interests they had in their buildings, and had failed to deliver apartments or refunds to their applicants long before this time.

Defendants argue that the court erred in considering transactions with persons other than the Dotsons, and cite *People* v. *Livermore,* 390 Ill. 85, in support of their contention. The *Livermore case* merely holds that evidence of other transactions may be introduced after testimony implicating the accused in the case on trial is presented. That was done in the instant case. Moreover, in the *Livermore case* the evidence of other transactions involved conduct of the conspirators more than two years before the offense charged, whereas in the case at bar the other transactions were contemporaneous with, or just preceding and following, the Dotson case, and consequently tended to reveal defendants' intention in the Dotson transaction, as well as their scheme of operations.

With reference to the Dotson transaction defendants contend, first, that they made no representations of ownership of the building on Hyde Park Boulevard to Dotson. This assertion is not only contradicted by the statements of Dotson and his wife, but by the reasonable inferences from defendant Glenn's conduct. At his first meeting with Dotson, Glenn showed pictures of various buildings where they allegedly had apartments and said, "This is one of our buildings," thereby suggesting ownership. When he took Dotson and his wife to the vacant apartment in the

building Glenn further stated, "Mr. Dotson, you know that I would not have a key to this building if I did not own it." Moreover, even if he had said nothing, the fact that he had access to the apartment and could take the Dotsons there, coupled with his statement, which he admittedly made, that he could procure another apartment just like that one within ninety days, clearly implied control of the building by defendant or the corporation. If that were not sufficient, Glenn's further statement in September, when Dotson came to pay the $100 balance, that "we are doing some work over there," enhanced the impression of ownership of the building, particularly since it was made at a time when the rightful owners were in fact sandblasting the building.

Defendants' assertion that Dotson did not rely upon what Glenn told him, but upon the remarks of other applicants in the office, is also completely unsubstantiated by the evidence. It was only Glenn who told Dotson that they owned the Hyde Park Building; it was only Glenn who stated that if Dotson put up the money he would get an apartment in the building in ninety days or his money would be refunded; and it was Glenn who reassured him of the propriety of the transaction by affixing the corporate seal on the contract, and who repeatedly promised to get him an apartment in a few days during the ensuing months.

It is apparent that the instant case is in no way comparable to *People* v. *Koelling,* 284 Ill. 118, cited by defendants where the complaining witness made an independent investigation and confidence was inspired not by the defendants but from outside sources.

Defendants' explanation of their failure to secure an apartment for Dotson in the Hyde Park building because Mrs. Russo decided not to sell the property cannot be reconciled with the testimony of the Russos and the circumstantial evidence. The negotiations, if any, for the sale of the property had fallen through long before July

when Dotson was shown the apartment. Defendants knew that the property was not for sale, and had access to the apartment only pursuant to an agreement with the Russos to keep it vacant, for which defendants had paid $300 in May. Hence defendants' assertion that the purchase of the building was being negotiated at the time Dotson was taken to the apartment is contrary to fact.

Defendants argue at length that there was a fatal variance between the allegation of the indictment jointly charging two defendants with the crime of violating the confidence game statute, and the evidence, which proved that only defendant Glenn had dealings with the complaining witness. Any attempt to isolate the conduct of defendant Summers from that of defendant Glenn in the Dotson transaction is not merely highly technical, but fictional.

Summers placed the ad in the newspaper which originally attracted the Dotsons, and paid for the advertising; Summers was the president and incorporator of Apartment Owners Inc., which was the corporation designated on the letterhead of the application filed by Dotson; Summers was the president of First Apartments Corporation with which Dotson signed the contract and to which he paid his money; Summers paid the Russos the $300 to keep the apartment in the Hyde Park building vacant, the apartment which lured Dotson into parting with his money so that he might secure a similar one within ninety days as Glenn promised; Summers, as well as Glenn, enjoyed the direct benefits from Dotson's check, since it was used to pay Antler in connection with defendants' joint venture of keeping apartments vacant in Antler's building on Forty-sixth street. It may be noted that this Antler who abetted defendants' plan to show applicants vacant apartments in order to induce them to part with their money, testified as to defendants' good character and reputation. The record further reveals that Summers participated with Glenn in trying to secure another $300 from Dotson in January,

1951, when Summers said that they had an apartment in a building on Forty-sixth Street but the man's wife was sick and they were not quite sure about it. In any case, another $300 would have to be paid for that apartment.

Thus it appears that although Glenn did much of the "smooth talking" to Dotson, Summers's operations were an integral part of their plan to first inspire confidence, by advertising in a respected newspaper, setting up an attractive office, utilizing impressive legal device, showing an ability to perform their contracts by visiting vacant apartments in buildings supposedly owned by defendants; and then to take the victims' money without any intention of either delivering an apartment or refunding the payment. Clearly, such conduct constitutes a violation of the confidence game statute.

Defendants' argument that they merely failed to perform a contract, but committed no crime, cannot be sustained, inasmuch as the evidence overwhelmingly establishes that defendants never intended to perform this contract and knew at the time it was entered into that it could not be performed. (*Chilson* v. *People,* 224 Ill. 535.) Moreover, defendants evidenced a similar intention in their transactions with other applicants, both preceding and following the Dotson case. Under these circumstances, the remarks of the court in the *Chilson case* are appropriate: "Chilson says he has been convicted merely 'for a failure to carry out a plain civil contract or for a breach thereof,' and that the distinction between the breach of a contract and the false and fraudulent scheme called the confidence game has been disregarded. If plaintiff in error had entered into the contract in good faith his reasoning would be conclusive. Where a contract apparently legal is entered into by one party with the intention of taking no step to carry it out, but with the wrongful intent of causing the other to part with his money without receiving any adequate consideration therefor, such contract may, and in this case did, be-

come a mere incident of the 'false and fraudulent scheme.' * * * The fact that the affair was made to assume the guise of an ordinary business transaction, whereby, as a preliminary, Spooner was required to pay his money for the lots, is without significance."

In the *Chilson case* the defendant advertised in a newspaper for a partner with $300 to go into the real-estate business. Spooner answered the ad, entered into an agreement with Chilson and put in his share of the price of lots to be purchased by the firm. Chilson, however, never carried out his part of the deal and was convicted of operating a confidence game, inasmuch as it appeared that he never intended to carry out his part of the contract, and used that device merely to obtain money from victims.

Although defendants cite *People* v. *West,* 406 Ill. 249, in support of their argument that their conduct did not violate the confidence game statute, it is not perceptible to this court how that case can be compared to the instant case. The parties therein had been doing legitimate business for over a year with the complainant cashing checks for the defendant, and all that was involved was one check being returned for insufficient funds, whereas in the case at bar defendants never intended to live up to any part of their agreement with Dotson, and all that he ever received for his money was a worthless note issued by a corporation without property.

Defendants further urge that the trial court overlooked the uncontroverted testimony of their good reputation. There is no showing that the court overlooked the probative value, if any, of this testimony submitted either by persons who were participants in the swindling operation, or by persons who admitted they knew nothing about defendants' financial affairs, or by persons employed by defendants, or closely connected with the lawyers who represented them.

The reference to the other indictments pending against defendants could in no way be deemed prejudicial to de-

fendants. The subject arose when the trial judge, just before imposing sentence, asked the trial assistant what he was going to do with the other cases which were on the docket before the judge. However, there was no statement made during the trial, nor before the finding of guilty, which in any way violated the rights of either defendant. Moreover, in their application for probation defendants themselves alluded to many of those other charges.

On the basis of the foregoing analysis, it is our judgment that the evidence clearly established the guilt of defendants of the crime of violating the confidence game statute, and that no errors were committed by the criminal court of Cook County in the course of the trial. Hence, the judgment of that court is properly affirmed.

*Judgment affirmed.*