(No. 35140.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BEN LEWIS, Plaintiff in Error.

*Opinion filed September 24, 1959—Rehearing denied Nov. 16, 1959.*

MYER H. GLADSTONE, of Chicago, (FRANK W. OLIVER, of Chicago, of counsel,) for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH and WILLIAM H. SOUTH, Assistant Attorneys General, and FRANCIS X. RILEY and WILLIAM L. CARLIN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAVIS delivered the opinion of the court:

By an indictment returned in the criminal court of Cook County, defendant was charged with having obtained from Louis Mufale money, goods and personal property of the value of $4,000 by means and use of the confidence game. On November 8, 1957, after trial before the court, defendant was found guilty of the offense charged. Motions for a new trial and in arrest of judgment were overruled.

Defendant then made application for probation. His counsel stated that defendant desired to make restitution to the parties who had testified concerning transactions with him; and that defendant owned a valuable property at 3810 West Lawrence Avenue in the city of Chicago which would be sold, if necessary. Counsel requested time for the purpose of working out a feasible plan to raise the necessary funds and the cause was continued to November 22, 1957. On that date little, if any, progress had been made and a request for a further continuance was granted.

Between November 22, 1957, and June 5, 1958, five hearings were held and six requests by defendant for further continuances were granted.

At the hearing on June 5, 1958, the court was advised by counsel representing interested parties that the value of the Lawrence Avenue property was only $80,000 to $85,000 instead of $134,000 as stated by defendant; that suit to foreclose a mortgage of $43,000 on the property had been filed and defendant had not apprised the court of such fact; that there were other claims involved in the foreclosure amounting to $15,000; and that on January 10, 1957, the Federal government had filed a claim for lien against defendant and his wife in the amount of $5,980.77. After hearing these undisputed statements, the court denied defendant's application for probation and sentenced him to confinement in the penitentiary for a term of not less than three nor more than ten years.

The principal contention made upon writ of error is that the evidence did not establish the *corpus delicti* of the crime. Specifically, defendant claims that there was no evidence from which the court could properly find that Mufale had confidence in the defendant; that, if such confidence existed, there was no proof that it was obtained by any false or fraudulent representation, trick or device on defendant's part; and that there was no showing that defendant abused any confidence reposed in him.

A proper consideration of these propositions requires a careful review of the evidence. However, the record is voluminous and it would unnecessarily prolong this opinion if we were to attempt to detail all of the testimony of the many witnesses for the People. Therefore, we shall review the evidence concerning the Mufale transactions, which were the basis of the indictment, and refer briefly to the typical testimony of other witnesses relative to similar contemporaneous deals with the defendant.

Louis Mufale, herein referred to as Mufale, a police

officer of the city of Chicago, testified as follows concerning this transaction: In September of 1955, he and his wife were living in an apartment at 2112 N. Sheffield Avenue and his father and mother occupied the flat above him. At that time the two families were interested in obtaining adjoining lots for homes. Since Mufale was a police officer, it was necessary that he live within the city's corporate limits. About September 10, 1955, the Mufales were out riding and saw a sign advertising the construction of homes for $17,000. They visited and inspected a "model home" in Norwood where they met a salesman representing the defendant. Mufale explained to the salesman that he was not interested in a home in that locality and the salesman stated that defendant was going to get some lots in the city and asked if he would be interested in them. Mufale assured him that he would be and stated that he desired one for himself and one for his parents.

As a result of a telephone call received about three weeks later, Mufale, his wife and parents went to the offices of Lawrence Home Builders at 3810 Lawrence Avenue, and met defendant and the salesman whom they had previously contacted. Defendant showed them a list of lots located in the Lawrence and Austin area of the city and asked them to take a ride and pick out the lots they wanted. The list included adjoining properties at 4820-4822 Melvina Avenue.

On October 12, 1955, Mufale and his parents met defendant at the Lawrence Avenue offices and told him that they had selected the adjoining lots on Melvina. Defendant told them that he had an option to buy these properties and, when asked if the lots were clear, stated that "all he had to do was go over and present the check—he had first chance to buy." At that time defendant accepted $100 from Mufale and $100 from his parents to bind the agreement, but told them they would each have to bring in another $900 to "start the deal rolling on these houses." The

additional amounts were furnished as requested on October 15, 1955, by two cashier's checks each in the amount of $900.

Receipts dated October 12, 1955, were given to Mufale and his father by defendant. Each receipt acknowledged that defendant had received from the payor the sum of $1,000 as a deposit on the purchase of a new home to be constructed at "Lawrence and Austin Area, Chicago, Illinois" on "lot to be selected from lot list furnished;" and thereby defendant promised "to build a new home on said lot for the undersigned in accordance with the usual form of construction contract of Lawrence Home Builders" which "the undersigned agreed to sign when presented." The total cost, including the lot, which "Lawrence Home Builders will procure," was specified as $16,950. The receipts further provided: "If the above described lot is not obtainable, then said home shall be constructed on any other lot mutually agreed upon by the parties hereto." The respective documents were signed by the Mufales and were executed by defendant as "Lawrence Home Builders, by Ben Lewis, sole owner."

Early in November, Mufale received a telephone call in which defendant stated that he wanted to see him and his parents. When they arrived at defendant's office, he told them that he was ready to purchase the lots at 4820 and 4822 Melvina and requested that they each pay an additional $3,000 and sign construction contracts. Such contracts, as prepared by defendant, were signed on November 12, 1955. The contract signed by Louis Mufale and wife provided for the construction of a new home on the real estate described as 4822 N. Melvina Avenue and that signed by the elder Mufales made similar provision with reference to the lot described as 4820 N. Melvina.

Both contracts recite that the Mufales are the "owners" of the respective lots but contain the further provision that Lawrence Home Builders would purchase the lots as agreed

upon at a price not to exceed $3,000, to be included in the total contract price, and that a Chicago Title & Trust Company policy would be furnished by the builder. The contracts were signed for Lawrence Home Builders by "Ben Lewis, Sole owner." Shortly after the execution of these contracts, the Mufales delivered two cashier's checks to defendant payable to the order of Lawrence Home Builders, each in the amount of $3,000, which were endorsed: "Lawrence Home Builders, Ben Lewis, Sole owner," and cashed. Defendant told the Mufales that all he had to do was to present a check to receive title to the lots and that he was going to start building in ten days.

Two or three weeks passed during which the defendant neither began construction nor contacted the Mufales, so Mufale called him by telephone. Defendant stated that he was "having a little difficulty" purchasing the lots; that some school teacher owned them and he had been unable to get her signature on the deed. This was early in December. Following this conversation Mufale checked on the ownership of the lots and found that title was in Victor Werner. About December 15, Mufale saw defendant at his office, advised him that he knew title was in Werner; and that Werner had told a friend of his that no one had ever contacted him concerning these lots. Defendant became angry, stated that he knew Werner owned the lots; and that he had been trying to buy them from him and accused Mufale of trying to "queer his deal" with Werner.

By February of 1956, defendant had not purchased the lots and the Mufales were becoming impatient. Some time during that month defendant suggested an alternate set of lots located at 4815-19 North Merrimac Avenue and asked the Mufales to look at them. After inspecting these lots Mufale told defendant they would accept them and asked defendant if he owned them. Defendant assured him that he could get them but Mufale insisted that a definite time be set for such purchase. Accordingly, defendant wrote the

following letter to Louis and Dominic Mufale dated March 1, 1956: "Gentlemen: Please be advised that I have purchased lots located at 4815 and 19 North Merrimac, Chicago, Illinois. If these lots are not cleared and title received from forty-five days from the above date I will release you from all claims and return your deposit without any charges of any kind to you." These lots were never obtained, construction was not started and refund was not made.

When Mufale inquired about the progress in connection with the purchase of these lots, defendant told him that the lots were in an estate in which nine people were involved and that he could get only eight signatures. Defendant then suggested other lots but made no assurances of ownership. The Mufales looked at some of these lots, found them unacceptable, and in September 1956, demanded a refund.

Victor Werner, a witness for the People, testified that on June 2, 1955, he became owner of the lots located at 4820 and 4822 Melvina Avenue; that he had never given anyone an option to buy them; and that they had never been for sale because he was engaged in the construction business and used such vacant lots as building sites. On cross-examination he admitted that someone whose name he did not recall may have telephoned him about the possible sale of these properties but he denied that defendant had ever contacted him. He had no recollection of any specific inquiries.

Eight other witnesses testified concerning dealings with defendant during the period from late 1954 through the summer of 1956. While their testimony differs in detail, it may fairly be said that their experiences were almost identical to those of the Mufales. Each witness made a substantial deposit with defendant for the purchase of a certain lot and the construction of a home after representations by defendant concerning the availability of the property. In each case the result was the same—failure of defendant to furnish the lot, construct the home, or to

make a refund. Since the testimony of these witnesses, *mutatis mutandis*, relates the same story, we shall refer briefly to only three of these transactions.

The record establishes that defendant represented that a lot located at 6344 West Giddings Street was available to three sets of people at different times. Mr. and Mrs. Olbrisch contracted to purchase it under arrangements made with defendant in September of 1955. It was also on the list which defendant furnished to Mr. and Mrs. Ehas in January, 1956, and again in June, 1956, after he failed to furnish them a lot at 7113 Berwyn Avenue, at which time he demanded more money. He also represented the lot as available to Mr. and Mrs. Wagner in February of 1956, before they selected a lot on Melvina Avenue, and finally in January, 1957, it was again offered to Mr. and Mrs. Olbrisch at an increased price because its value had "appreciated."

Defendant was the only witness on his behalf. He stated that he had been in the business of building and modernizing homes in the city of Chicago since 1932; that he first engaged in new construction in 1946 when he incorporated the Avers Construction Co.; and that from 1946 until 1954 he built about 200 new homes. In 1954 defendant began doing business individually as Lawrence Home Builders. In the years 1954 through 1956 he completed about 33 houses. During 1957, he undertook the construction of 6 ranch-type homes and two small apartment buildings. Four of the homes were completed. Defendant stated that he was an approved contractor with the Veteran's Administration, which had authorized about a dozen loans on homes constructed by him.

As to his transactions with the various complaining witnesses, defendant denied that he had ever told any of them that he owned the lots or had an option to buy them. He testified that he only told them that the lots were "available" or "obtainable." In explaining the lists furnished, he said that he had an agent compile a list of the vacant lots in

the neighborhood; that he then secured a title report and obtained the names of the owners after which he contacted them and, if they were willing to sell at a given price, he "would take it for granted that if we wanted the lot we could buy it." As to the lots on Melvina Avenue involved in the transactions with the Mufales, he testified that he "entered into a discussion" with the State Bank and Trust Company of Evanston with reference to buying them; that when Mufale came in and selected the lots he called the bank only to discover that the lots had been sold to Werner "just the week before." He testified that he had entered into an agreement with the Mufales to buy these two lots and build houses for them because he "had practically a definite understanding that these lots for $8,000 would be available." Defendant says he called Werner about buying these lots; and that Werner told him he would consider it but wouldn't give him an answer.

Meanwhile, defendant stated, Mufale became angry because he learned of some trouble defendant was having with a former salesman by the name of Nadborne who claimed defendant owed him some money in connection with a building deal. Defendant stated that Nadborne appeared at his office one Friday afternoon with a couple of "gun men" and beat him; that an account of the affair appeared in the papers; that on Monday morning Mufale came to his office, and accused him of cheating his partners and trying to cheat the Mufales. In defendant's words: "And that's when my vicious circle started going."

Defendant further testified that when Mufale discovered that Werner owned the lots, he demanded the return of his money and tried to deal directly with Werner in connection with the buying of the lots, and the building of the houses, but Werner refused. According to defendant, it was Mufale who suggested the alternate set of lots on North Merrimac Avenue. Defendant testified that he tried to buy these lots also; that they were in a trust which had nine beneficiaries;

that he reached a tentative agreement with some of them and made a deposit of $500; that there was a delay in getting the signatures and that, finally, the lots were "sold out from under" him for $1,000 more than he had offered and his deposit was returned.

Defendant also blamed Mufale for spoiling this deal because of an inquiry made by him at the Chicago Title and Trust Company concerning titles. Defendant testified that he accused Mufale of sending others to the title company to buy the lots, which Mufale denied. In concluding his testimony as to the Mufale transactions, defendant stated that he did not take their money with intent to defraud them; that he "always intended to build them a home;" that his offers of other lots were refused because he couldn't deliver "anything satisfactory" to them, so he "just let the deal lay." He offered no explanation of his failure to return their deposits in accordance with his letter of March 1, 1956.

In explaining the other transactions, defendant again referred to the "vicious circle" in which he claimed he had been involved by his customers because of their distrust in him following the Nadborne affair. He stated that Mr. and Mrs. Wagner came to his office in June of 1956, told him they did not want to do business with him and demanded their money back at a time when he intended to build a home for them and thought "he had the lot deal practically completed." However, he admitted that he had no interest in the lot at 4911 Melvina Avenue which he had contracted to sell to them and for which he had received $4,500; that he never acquired title to it; and that it was owned by a man named Leonard Shein, who told defendant that he would never sell it.

In referring to the transaction with the Ehases, he stated that he had been negotiating for the purchase of the lot they wanted but that no construction agreement was ever signed because their attorney insisted on a time limit

in the contract, which he refused. He did not claim, however, that he was able to deliver title to the lot at 7113 Berwyn Avenue pursuant to his contract with them. On cross-examination, he admitted that he had never had any legal interest in the Berwyn Avenue property; and that he talked with the owner, Howard Ziegler, who said he wanted to build and would not sell. This conversation occurred before defendant entered into contract with Mr. and Mrs. Ehas.

In connection with the Olbrisch transaction, he testified that after the lot at 6344 West Giddings Street had been agreed upon and a deposit made, they called him stating they did not want to go through with their deal; and that they desired another location. Defendant stated that he sent them a telegram mentioning the area specified by them and informing them he would try to find a lot for them there, but that Mrs. Olbrisch sent a return wire telling him that the idea of changing the location was his, not theirs. Defendant stated that this dispute continued for some months; and that finally an attorney representing the Olbrisches advised him that they would accept the original location on Giddings Street, but he refused and told them that they could not purchase the lot in 1957 at the same price which they had agreed to pay for it in 1955. Defendant admitted that he had no interest in the Giddings Street lot in September, 1955, when he received $5,000 from the Olbrisches; that he had no option to buy it, but later acquired one on February 23, 1957; and that he did not take title in his name when the lot was finally conveyed in July of 1957. He stated: "I never took title to any lot in my name."

In all these cases in which the lot was not furnished, the home not built and refund not made to the parties, even after demand, defendant testified that it was the customer who had refused, for one reason or another, to complete the deal. He further stated that his customers had involved

him in all kinds of trouble, not only with other customers, but with contractors as well, with the result that "they made a vicious circle" for him and he "couldn't even complete the buildings" he had; that he had been fighting to stay in business for the last two years; and that he was not going to let anyone disrupt it.

From his lengthy cross-examination it appears that defendant operated businesses under various names, including that of Lawrence Home Builders, of which he was sole owner, Robert Solomon Construction Company, Weinstein & Lewis, and Terry & Lewis, the latter two entities being partnerships. In 1942 he filed a voluntary petition in bankruptcy. At that time he had apparently been doing business as Ehrlich Construction Company, Ehrlich Building Maintenance and Ehrlich Building Materials. During the war he worked for Chrysler as special agent in connection with buildings. In 1947, defendant, his wife and her sister formed the Avers Construction Company, a corporation, of which defendant was president. This corporation ceased to function in 1954, was finally dissolved in 1957, and then had liabilities greater than its assets. After Avers ceased operations defendant, as an individual, continued in the building business under the name of Lawrence Home Builders, with offices at 3210 Lawrence Avenue.

In 1952 or 1953, defendant, his wife and daughter, formed the Cadillac Home Supply Co., a corporation which dealt in building materials, home equipment and appliances. It was in operation until 1957. Defendant was its president until 1954 when he ceased to hold that office, but became its manager. During the years in question here, defendant had no bank account, either in his own name or in the name of Lawrence Home Builders. Cadillac did have a bank account. When questioned concerning the disposition of the funds paid as deposits by the various complaining witnesses, defendant stated that he used them in his business conducted as Lawrence Home Builders, possibly to pay

bills. When questioned further, however, he admitted that in most instances funds were deposited in the account of Cadillac Home Supply Co. Defendant testified that the $8,000 received from the Mufales went into the Avers Avenue building, an apartment which he was constructing in a partnership venture with Milton Weinstein. When asked if it had been used in somebody else's building, defendant said: "Well, that is business. You do take money from one and use it in another business."

Defendant was shown the bank statements of Cadillac Home Supply Co. and questioned relative to them. The record shows that during the period from September 1, 1955, until the account was closed on September 21, 1956, it was overdrawn much of the time. The largest daily balance at any time during the entire period was $5,541.87 on September 16, 1955. Defendant admitted that during this period he received a total of $33,000 from the complaining witnesses in this case.

Defendant likewise admitted lack of ownership or interest in the lots at 4820-22 Melvina Avenue which were involved in the Mufale contracts when he received $8,000 from them in October and November, 1955, and he did not claim that he ever had or later acquired such an interest. The most he could say was that he "entered into a discussion" relative to their purchase.

When questioned concerning his interest in the other lots at the time the deposits were received, defendant was evasive, but finally admitted that he had no "legal or monetary" interest in them. His cross-examination concluded the testimony in the case except for statements made by him on redirect examination relative to equities he claimed in certain properties under construction or already completed.

The crime with which defendant was charged is defined in section 98 of division I of the Criminal Code, (Ill. Rev. Stat. 1957, chap. 38, par. 256,) which provides: "Every person who shall obtain or attempt to obtain from any other

person or persons any money, property or credit by means or by use of any false or bogus check or by any other means, instrument or device commonly called the confidence game shall be imprisoned in the penitentiary not less than one year nor more than ten years." The statute was designed to reach the class of offenders known as "confidence men" who practice swindling schemes, "as various as the mind of man is suggestive," upon unwary victims. *People v. Jackson,* 4 Ill.2d 296; *People v. Martin,* 372 Ill. 484; *Morton v. People,* 47 Ill. 468.

The gist of the crime of confidence game is the obtaining of the confidence of the victim by some false representation or device. (*People v. Harrington,* 310 Ill. 613; *People v. Peers,* 307 Ill. 539.) It covers any fraudulent scheme, trick or device whereby a swindler wins the confidence of his victim and then cheats him out of his money or property by taking advantage of the confidence reposed in him. *People v. Jackson,* 4 Ill.2d 296; *People v. Priola,* 395 Ill. 296; *People v. Marmon,* 389 Ill. 19; *People v. Bimbo,* 369 Ill. 618; *People v. Peers,* 307 Ill. 539.

The form of the transaction is not material. (*People v. West,* 406 Ill. 249.) It matters not that it was made to assume the form of a lawful business deal if in fact it was a swindling operation. (*People v. Brand,* 415 Ill. 329; *People v. Glenn,* 415 Ill. 47; *People v. Marmon,* 389 Ill. 19.) But a swindling operation does not constitute the confidence game unless the element of confidence is present and it is not enough to show that money or property has been obtained by false pretenses, which have been defined as any designed misrepresentations of an existing condition by which a party obtains the goods of another. (*People v. Marmon,* 389 Ill. 19, 31; *People v. Peers,* 307 Ill. 539, 542.) The moving cause for the victim's parting with his money or property must be the confidence reposed in the accused. *People v. Gallowich,* 283 Ill. 360, 364.

The evidence in this record leaves no doubt in our minds that defendant made false and fraudulent representations to his customers which were deliberately designed to cause them to part with their money. Defendant not only represented that he was an able and experienced builder of moderately priced homes, but also that he could supply the lots upon which the houses were to be built. All of the witnesses, including Mufale, testified that defendant stated either that he owned or had an option to buy the lots which they selected. Although defendant denied making these representations, the contrary testimony of the nine witnesses for the People compels belief. Defendant might have been "misunderstood" upon one occasion by one of his customers, but not by nine of them upon nine isolated instances.

Moreover, there are other undisputed facts in the record which corroborate the testimony of the witnesses for the People on this point. It is undisputed that defendant furnished each prospect with a list of lots and invited such person to inspect them and select one as a building site. If defendant did not wish to be understood as representing that the lots were presently available for building purposes, he should not have supplied such lists. The evidence clearly shows that the various customers were not primarily interested in the purchase of a lot, but rather in building a new home; and that this was the reason the defendant was originally consulted. If defendant was not representing that he could build on the lots chosen, the inspection and selection was an idle gesture.

Further corroboration is found in the documentary evidence, including the receipts, directions to purchase and construction contracts, in which specific lots are mentioned. Defendant prepared and executed these instruments which clearly express, as the intention of the parties, that a home should presently be built on the lot selected and not upon some other lot in the indefinite future.

The evidence also demonstrates that defendant's representations as to option or ownership were known by him to be false when made. He admitted on cross-examination that, at the times the deposits were made and contracts executed, he had no interest, "legal or monetary," in these lots. His testimony, that in some cases he later made an effort to acquire the properties, is unimpressive and immaterial. In the Mufale transaction, which was the subject of the indictment, defendant admitted that he never had any interest in the lots at 4820 and 4822 Melvina Avenue. Werner purchased these lots in June of 1955 and they were never for sale thereafter. Yet in October and November of that year defendant willingly accepted money from the Mufales with the assurance that he could build homes for them on these lots.

Defendant's principal contention is that the element of confidence is lacking, and that there was no proof that it was Mufale's confidence in him which caused Mufale to part with his money or property. Such confidence in the defendant was demonstrated not only by Mufale's direct testimony to that effect but also by the facts and circumstances in evidence, including his willingness to part with his money without receiving a deed to the lot; his ready payment of an additional $3,000 in November upon defendant's representation that he was "now ready to purchase" the lots on Melvina Avenue; his patience in the face of delays; his acceptance of defendant's explanations; and his acquiescence in defendant's suggestion to select other lots when defendant advised him that the lots originally chosen were not available.

The facts of this case are strikingly similar to those in *People* v. *Marmon*, 389 Ill. 19, in which we sustained a conviction of the confidence game. That case involved a sale of lots by defendants and an undertaking to build houses on them with representations that they could obtain priorities for materials for the various customers, when

defendants well knew that no such priorities were available. This was followed by a substitute plan in which defendants induced the purchasers to agree to take lots in another location on the representation that by taking such lots and paying an additional amount, they could readily dispose of them and come out with a profit. As in this case, the customer received no lot, home or refund.

Defendant argues that Mufale's lack of confidence is shown by the fact that he checked on the ownership of the lots and insisted on a time limit when he agreed to accept the lots on Merrimac Avenue. The evidence shows, however, that Mufale did not investigate title to the lots on Melvina Avenue until after defendant had received the money and failed in his promise to secure title and start building within ten days. Even then Mufale waited two or three weeks before calling the defendant and it was only after evasion and further delay on defendant's part that Mufale finally made his own investigation in December. It did not indicate a lack of confidence in the first instance or at the time a further $3,000 was paid. Even after discovering that Werner owned the lots on Melvina, Mufale was willing to let defendant substitute the lots on Merrimac Avenue. Apparently, his confidence was somewhat shaken, but not completely dissipated. His acquiescence serves to emphasize the extent of the confidence reposed. He had trusted defendant once and was willing to do so again even after he had grounds to believe that defendant had lied to him.

The fact that he was ready to give defendant the benefit of the doubt while insisting on a time limit cannot be urged as an indication of lack of confidence. Mufale had already parted with $4,000 and was naturally anxious that his home be started at the earliest possible date or his money refunded. In return for giving defendant another chance to perform he received only another false representation and promise. In his letter of March 1, 1956, defendant defi-

nitely stated that he had purchased the lots at 4815 and 4819 North Merrimac Avenue and would return all deposits if title was not cleared within 45 days. In truth and in fact, defendant had not purchased these lots and the money was never refunded. The evidence clearly supports the finding of the trial court that defendant was guilty of operating a confidence game.

The intention to defraud and the existence of a common scheme or design are established by the testimony of the eight witnesses who told of similar transactions with defendant. This testimony was competent. (*People* v. *Priola,* 395 Ill. 296, 299 and 300; *People* v. *Marmon,* 389 Ill. 19, 34.) Defendant held himself out as an experienced builder of homes, able to construct homes and supply the building sites at moderate cost. He could do this, he said, because he bought material in large quantities for the many houses he was building.

There can be no doubt that these representations were intended to and did secure the confidence of his prospective customers, including Mufale. Defendant's representation that he owned or controlled the large number of lots on the lists furnished, while inspiring confidence, was obviously false. The proof concerning defendant's finances is further evidence of his lack of intention to perform the agreements. Defendant must have known that he lacked the resources necessary to carry out the terms of the many contracts involved in this case. An abuse of Mufale's confidence, once obtained, is well established by the fact that defendant failed to return his money even after agreeing definitely in his letter of March 1 that he would do so.

Our conclusion is supported by our decisions in *Marmon, People* v. *Brand,* 415 Ill. 329, and *People* v. *Glenn,* 415 Ill. 47, in which convictions of the confidence game were sustained. *Brand* involved a failure to build a house on the lot of complaining witness after acceptance of a down payment under circumstances showing fraud and a breach

of confidence. Only one transaction was involved. *Glenn* concerned a failure to secure rental apartments for numerous complaining witnesses after the acceptance of deposits under circumstances showing that defendants had no apartments to rent and no hope of fulfilling their agreements, coupled with a failure to return the deposits on demand. None of the cases cited by defendant involves facts or transactions similar to those in this case or the cases above mentioned.

Defendant also contends that the People failed to prove the identity of the subject matter obtained by defendant from Mufale as alleged in the indictment. The indictment charges that money and property of the value of $4,000 were received, but further specifies that this amount was in coin and currency. The evidence shows that $100 was paid in cash and the balance in the form of two cashier's checks, one for $900 and another for $3,000. Counsel for the People contend that the checks were property, citing *People* v. *Bertsche*, 265 Ill. 272, 283.

Even if we assume that the People must prove that money was received because they elected to specify that medium, they were not required to prove that the money was in the amount alleged in the indictment. (*People* v. *Bertsche*, 265 Ill. 272.) There is nothing in the confidence game statute which requires that the value of the money or property obtained shall be of any specified amount in order to constitute the crime charged. Even in larceny cases where proof of value is essential to distinguish between a felony and a misdemeanor, it is unnecessary to prove the value alleged in the indictment. The judgment will be sustained if the value proved and found is sufficient to establish the grade of the offense and support the judgment and sentence. *People* v. *Nelson*, 399 Ill. 132, 134, 135; *People* v. *Taylor*, 391 Ill. 11, 15.

Since the evidence in this case conclusively shows that $100 in cash was received by defendant from Mufale, that

in itself is sufficient to establish the charge made in the indictment relative to the identity of the subject matter obtained. We reject, as without merit, defendant's argument that the proof does not sustain the conclusion that Mufale's confidence had been obtained at the time the $100 was paid.

The evidence warrants the conclusion that Mufale's confidence was obtained by false and fraudulent representations by defendant which were part of a common scheme or design to swindle Mufale; and that Mufale was caused to part with his money and property, including the initial payment of $100 in cash, as a direct result of the confidence reposed in defendant.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*