**People of the State of Illinois, Defendant in Error, v. Ralph Spector and Sam Testa, Plaintiffs in Error.**

**Gen. No. 49,380.**

First District, Fourth Division.

February 19, 1964.

Rehearing denied March 12, 1964.

Robert W. Heinze, Harold H. Winer and Sterling S. Suga, all of Chicago, for plaintiffs in error.

' William G. Clark, Attorney General, of Springfield (Daniel P. Ward, State's Attorney of Cook County, Fred G. Leach and E. Michael O'Brien, Assistant Attorneys General, and Edward J. Hladis and William J. Martin, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE DRUCKER delivered the opinion of the court:

This is an appeal by the defendants, Ralph Spector and Sam Testa, from their conviction, after a bench trial in the Criminal Court of Cook County, on charges of conspiracy to defraud both the buyers and sellers in a real estate transaction. Testa was sentenced to a term of one to three years in the penitentiary and Spector received a sentence of one to five years.

Defendants' first ground for reversal is that the evidence is not sufficient in law to establish that Testa knew of or took part in the alleged conspiracy. The evidence adduced at the trial showed that Ralph

Spector, along with his father, Samuel Spector, owned and managed the Boulevard Realty and employed Sam Testa as a salesman. On December 14, 1959, Mrs. Savannah Scott saw an advertisement in the Chicago Defender, a daily newspaper, for a six-room house available through the Boulevard Realty for $500 down. She telephoned the Boulevard office and was referred to Testa. An appointment was made to view the house. The next day Testa picked up Mr. and Mrs. Scott at their apartment and first showed them a two-flat building at 74th and Kenwood, giving them helpful hints on how to fix up that building. Mrs. Scott, however, insisted on a house. Testa then showed them the Curran house. After seeing it, Mrs. Scott asked the price and Testa told her they would have to go back to the Boulevard office as he did not know the price. Testa pointed out various defects in the Curran house and repeatedly indicated that he thought the two-flat was a better buy. When they arrived at the office, Testa obtained "a little black book" and informed the Scotts that the Currans wanted $14,500 for the property. After the Scotts said they could not pay this much, Testa, after consultation with Ralph Spector, suggested that they make an offer. Mrs. Scott made an offer for $12,000 and Testa suggested that they raise it to $12,500 and trust him to try to lower the price with the sellers. Furthermore, when Mrs. Scott indicated that she wanted to consult an attorney before signing any papers, Testa prevailed upon her not to, arguing that this would just be a waste of money in view of the fact that Boulevard had its own attorney who would supervise the transaction at no cost to the Scotts. The offer was then signed and the $500 was deposited on December 18th. The undisputed evidence shows that Mr. Curran, the seller, had indicated to Ralph Spector that he hoped to sell the house for $9,500. Later, Spector urged Curran to sell for $8,200 before the property deteriorated because of the

105

racial change in the neighborhood, and Curran signed at this price. Both Mr. and Mrs. Curran testified that the Scotts' offer of $12,500 was never communicated to them.

The circumstances of inspecting "the little black book" for the sales price and the two consultations with Spector and the offer to get a lower price from the seller, clearly belie Testa's protestations of innocence and lack of knowledge.

Counsel for defendants argues that Testa was obviously not part of a conspiracy, pointing to his relative newness as a salesman and the fact that he continually tried to talk the Scotts into taking the two-flat at 74th and Kenwood instead of the Curran house.

However, the entire course of Testa's dealings with the Scotts contradicts this argument. On December 22nd he telephoned the Scotts and asked them to come right over to the Boulevard office. Upon their arrival Testa informed them that their offer of $12,500 had been rejected by the Currans, and the least that was acceptable was $13,500. Mrs. Scott demanded her $500 deposit back but Testa refused to return it. After again trying unsuccessfully to interest the Scotts in another house, Testa turned his powers of persuasion to the Curran home, urging that the Scotts give up cigarettes in order to be able to meet the payments that a purchase price of $13,500 would call for. This whole course of conduct, in view of the testimony of the Currans that the Scotts' offer of $12,500 had never been communicated to them, clearly indicates Testa's active duplicitous role in the dealings. His attempt to get a larger commission by selling a higher priced two-flat instead of a house was not an indication of naiveté, inexperience or good will.

Defendants next urge that the evidence is insufficient, as a matter of law, to support their convictions for the crimes charged in the indictment.

106

The first two Counts of the indictment charge the defendants with conspiracy by use of a confidence game perpetrated to defraud the Scotts first of the $5,300 difference in price and second of their $500 deposit. We believe that the evidence clearly supports conviction on these counts. The Illinois Supreme Court set out the requirements for a conviction for the statutory crime of "confidence game" in People v. Martin, 372 Ill 484, at p 486, 24 NE2d 380:

> It covers any scheme whereby a swindler wins the confidence of his victim and then swindles him of his money or property by taking advantage of the confidence fraudulently obtained . . . . The moving cause for the victim's parting with his money or property and giving it to the accused must be the confidence reposed in the accused.

Since the indictment charged the defendants with a conspiracy to obtain money by means of confidence game, it must be shown that the Scotts reposed confidence in defendants. The evidence shows that they easily let themselves be talked out of obtaining the services of an attorney. When Testa prevailed upon the Scotts to raise their offer from $12,000 to $12,500, after his consultation with Ralph Spector, he promised the Scotts that he would try to lower the price in his dealings with the Currans. The Scotts testified that Ralph Spector promised that they could have rent-free occupancy of an apartment if the Curran deal was not closed by the expiration of their lease. Testa convinced the Scotts that they could afford the payments on a $13,500 house in nice "plain folks" talk, even to the point of working out a tentative budget for them and saying that he himself was paying $118 a month on his house. Mrs. Scott testified that they thought Testa was "very friendly and nice,"

107

and the people at Boulevard were "just like a family."

A somewhat similar case was presented to the Supreme Court of Illinois in People v. Lewis, 17 Ill2d 403, 161 NE2d 821 (1959). There the defendant obtained money from one Mufale on the promise to exercise an option on some land owned by the defendant and to build a house thereon for Mufale. At the trial evidence was adduced to prove that Lewis had never owned the property nor had he ever owned an option on it. The court there stated, at page 418:

> Defendant's principal contention is that the element of confidence is lacking, and that there was no proof that it was Mufale's confidence in him which caused Mufale to part with his money or property. Such confidence in the defendant was demonstrated not only by Mufale's direct testimony to that effect but also by the facts and circumstances in evidence, including his willingness to part with his money without receiving a deed to the lot; his ready payment of an additional $3,000 in November upon defendant's representation that he was "now ready to purchase" the lots on Melvina Avenue; his patience in the face of delays; his acceptance of defendant's explanations; and his acquiescence in defendant's suggestion to select other lots when defendant advised him that the lots originally chosen were not available.

The elements of confidence are clearly evident here and obviously refute defendants' contention that the Scotts were not "pushed," "persuaded" or "conned." Moreover, the fact that the defendants conspired to perpetrate a confidence game under the guise of a business transaction is not material. "It matters not that it was made to assume the form

108

of a lawful business deal if in fact it was a swindling operation." People v. Lewis, supra, at page 416. People v. Marmon, 389 Ill 19, 58 NE2d 603.

█ The third Count of the indictment charged the defendants with conspiring to cheat and defraud the Scotts of $500 by the use of false pretenses. The crime of false pretenses is defined as follows: "any designed misrepresentation of an existing condition by which a party obtains goods of another." People v. Martin, 372 Ill 484, 486, 24 NE2d 380. 19 ILP, False Pretenses, § 2. Here the record discloses numerous false representations and nondisclosures of material facts on the part of the defendants. Among these we may point out the fact that the Scotts were told that the Currans were asking $14,500 for their house when it was known to Spector, and presumably to Testa, that Curran wanted only $9,500; the fact that the Scotts, after being induced to make an offer of $12,500, were informed that the Currans had rejected that offer and would go no lower than $13,500, although Mr. Curran testified that Spector had never even informed him of the existence of the first Scott offer; and the nondisclosure to any of the parties of the tri-partite agency engaged in by Boulevard, viz., action allegedly on behalf of such diverse clients as the Scotts, the Currans, and a Max Sherman. Mr. Sherman, a defendant in the indictment, was never served with process, was described as a speculator and was implicated by Ralph Spector as the purchaser-to-be of the Curran property and the seller-to-be to the Scotts. The evidence leaves little doubt as to defendants' guilt on this count.

█ The fourth and fifth Counts of the indictment charge that defendants conspired to obtain the signatures of the Currans and the Scotts through false pretenses. Defendants submit that Counts 4 and 5 do not fall within the confines of the conspiracy statute which reads:

109

If any two or more persons conspire or agree together . . . to *obtain money or other property by false pretenses* . . . they shall be deemed guilty of a conspiracy; and . . . shall be fined not exceeding $2,000 or shall be imprisoned in the county jail not exceeding one year, or shall be imprisoned in the penitentiary for a term of not less than one year and not exceeding five years, or may be so fined and so imprisoned in the county jail or penitentiary. (Ill Rev Stats 1959, c 38, § 139.) (Emphasis added.)

Their reasoning is that the conspiracy statute does not include the charge of obtaining the signature of any person to any written instrument but only to the obtaining from any person of any money, personal property or other valuable thing. This proposition of law was specifically ruled on in People v. Warfield, 261 Ill 293, where the court said at page 329, 103 NE 2d 979:

While it is true that the false pretense statute provides for the punishment not only of one who by any false pretense obtains the money or property of another, but also of one who by the same means obtains the signature of any person to any written instrument or "other valuable thing," the conspiracy statute does not provide for the punishment of persons entering into a conspiracy to violate the false pretense statute except for the purpose of obtaining the money or property of another by means of false pretenses.

Therefore we must conclude that there should have been a finding of not guilty on Counts 4 and 5.

██ Finally, the defendants urge that the oral finding of the trial court at the conclusion of the trial that the defendants were guilty of conspiracy "to cheat and defraud the Currans and the Scotts" is so

vague and indefinite that it compels the conclusion that the findings were on Counts 4 and 5, thereby impliedly acquitting the defendants on Counts 1, 2, and 3. The defendants' rationale for this conclusion is basically that since they were found guilty of defrauding "the Currans and the Scotts," the finding must relate to the only element in common between them, that is, a conspiracy to obtain their signatures by false pretenses.

This argument is specious and unconvincing. The trial court found the defendants guilty of "conspiring to cheat and defraud the Currans and the Scotts . . . as charged in this indictment" (Record, page 528). Besides, the Common Law Record shows "Finding of Court that defendant, Ralph Spector is guilty of conspiracy in the manner and form as charged in the indictment. Finding of Court that defendant, Sam Testa is guilty of conspiracy in the manner and form as charged in the indictment."

In Johnson v. People, 16 Ill2d 478, the court said, at pp 481–82, 158 NE2d 42: "In one sense the oral statement made by a trial judge relative to his conclusions and the sentence to be imposed is a judgment, but that does not mean that the statement need be in the exact words of the formal judgment as finally recorded."

A finding of guilty "in manner and form as charged in the indictment" is a finding of guilty on each count of the indictment (People v. Keagle, 7 Ill2d 408, 131 NE2d 74; People v. Strong, 21 Ill2d 320, 172 NE2d 765; People v. Green, 27 Ill2d 39, 187 NE2d 708), and is sufficient to sustain conviction on Counts 1, 2 and 3. The judgment is therefore affirmed as to Counts 1, 2 and 3 and reversed as to Counts 4 and 5.

Affirmed in part, reversed in part.

ENGLISH, P. J. and McCORMICK, J., concur.